IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMBIT CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C. A. No. 09-10217-WGY |
| v. | ) | |
| | ) | |
| DELTA AIR LINES, INC. and | ) | |
| AIRCELL LLC, | ) | |
| | ) | |
| Defendants. | | |

## PLAINTIFF AMBIT CORPORATION'S PRELIMINARY *MARKMAN* BRIEF

HAMILTON, BROOK, SMITH & REYNOLDS, P.C.
Brian T. Moriarty (BBO# 665995)
brian.moriarty@hbsr.com
David J. Thibodeau, Jr. (BBO# 547554)
david.thibodeau@hbsr.com
David J. Brody (BBO# 058200)
david.brody@hbsr.com
Benjamin P. Hurwitz (BBO# 666337)
benjamin.hurwitz@hbsr.com
530 Virginia Road
P.O. Box 9133
Concord, Massachusetts 01742-9133
Telephone:  (978) 341-0036
Facsimile:  (978) 341-0136

GESMER UPDEGROVE, LLP
Lee T. Gesmer (BBO# 190260)
lee.gesmer@gesmer.com
Joseph J. Laferrera (BBO# 564572)
joe.laferrera@gesmer.com
40 Broad Street
Boston, Massachusetts  02109
Telephone:    (617) 350-6800
Facsimile:    (617) 350-6878

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

I.    INTRODUCTION TO THE '858 PATENT ................................................................ 1

      A.    Brief Summary ................................................................................................ 1

      B.    The Claims of the '858 Patent........................................................................ 2

      C.    The Prosecution History of the '858 Patent .................................................. 2

II.   GENERAL LEGAL PRINCIPLES OF CLAIM CONSTRUCTION ............................... 3

III.  THE DISPUTED CLAIM TERMS ......................................................................... 6

      A.    The Preamble of Each Claim in the '858 Patent is Not Limiting and
            Does Not Add a Personal Communication Device Element or a Distant
            Communication System Element ..................................................................... 6

      B.    Personal Communication Devices ................................................................. 9

      C.    The RF Antenna ............................................................................................ 12

            1.    First RF Antenna................................................................................. 13

      D.    To Communicate ........................................................................................... 14

      E.    The Communications Link ........................................................................... 14

      F.    The Control Computer................................................................................... 16

            1.    "Arranged to Control a Communications Link" or "Operating a
                  Control Computer in a Communications Link" or "Placing a
                  Control Computer in a Communications Link" ................................... 17

            2.    "Control Use and Time"...................................................................... 18

            3.    "To Bill for the Time" and "Bill for Use"............................................ 19

            4.    "Filter or Switch Communication" and "Filtering said RF
                  Signals" ............................................................................................... 20

            5.    "Regulating Use of" ........................................................................... 21

      G.    RF Signal ...................................................................................................... 21

      H.    RF Signal Shield ........................................................................................... 22

      I.    Local RF Restricted Environment................................................................. 24

IV.   CONCLUSION................................................................................................... 25

APPENDIX A ........................................................................................................... 26

APPENDIX B ........................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Abbott Labs v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274 (Fed. Cir. 2003) .............................. 24

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801 (Fed. Cir. 2002) ................................................................................................. 6, 7

*Everpure, Inc. v. Cuno, Inc.*, 875 F.2d 300 (Fed. Cir. 1989) ......................................................... 4

*Fujifilm Corp. v. Papst*, 2009 U.S. Dist. LEXIS 49870 (D.D.C. June 12, 2009) ................................................................................................. 8

*Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289 (Fed. Cir. 2004) .................................................... 8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351 (Fed. Cir. 2008) ........................................................................................... 4

*Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) .................................................... 3, 4, 5

*Specialty Composites v. Cabot Corp.*, 845 F.2d 981 (Fed. Cir. 1988) .......................................... 4

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279 (Fed. Cir. 2008) ......................................................................................... 6, 7

### Other Authorities

1993 IEEE Dictionary ................................................................................................... 25

Merriam-Webster Online Dictionary, retrieved from http://www.merriam-webster.com/dictionary/personal............................................................ 11, 13, 22

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th Ed.), *available at* http://dictionary.reference.com/browse .......................................... 16, 21, 23

Plaintiff AMBIT Corporation ("AMBIT") respectfully submits this brief to address the claim terms of U.S. Patent No. 7,400,858 (the " '858 Patent"), titled "Radiative Focal Area Antenna Transmission Coupling Arrangement," which generally relates to a system for allowing devices in certain remote locations to communicate with distant locations, such as from an aircraft to a ground-based station. A copy of the '858 Patent is attached as Exhibit A to the Declaration of Benjamin P. Hurwitz, Esq. ("Hurwitz Decl."). This brief addresses AMBIT's construction of those terms that are actually contested by defendants.[1]

## I.    INTRODUCTION TO THE '858 PATENT

### A.    Brief Summary

Over the past several years, wireless communication through use of personal computer devices, *e.g.*, laptop computers and personal digital assistants, such as WiFi-enabled Blackberry® devices, has become ubiquitous. Owners of such devices are accustomed to remaining in communication with outside computer networks, *e.g.*, the Internet, virtually at all times. However, there are still places where such wireless communication capability is either not allowed or is not practical, such as in an aircraft. Indeed, because a wireless personal computer device typically has a communication range of, at best, several hundred feet, such devices ordinarily cannot reach ground-based networks 35,000 feet below the speeding aircraft cabin.

---

[1] As required by the Scheduling Order in this case, AMBIT proposed definitions to all terms it believed should be construed and exchanged its proposal with defendants Aircell LLC ("Aircell") and Delta Air Lines, Inc. ("Delta"). While all parties have proposed modifications or amendments to some proposed definitions, defendants have not made any proposal to a large number of terms, and thus do not contest many of AMBIT's proposals. There are also several terms where the parties have proposed identical definitions, and these terms are also uncontested. Attached as Appendix A is a list of these uncontested claims terms which AMBIT respectfully requests that the Court accept for purposes of this litigation.

The invention claimed in the '858 Patent anticipated this problem of how to use wireless devices in restricted environments more than a decade ago and addresses this problem in a novel way by providing an onboard-the-aircraft system to pick up wireless, radio frequency ("RF") signals from (and send to) personal computer devices in the aircraft cabin with a first antenna and to retransmit the signals to (and receive from) distant communications systems using a second antenna. The two antennae of the system are connected to each other via a communications link and a control computer. A control computer coupled to the communications link controls, *inter alia*, the times during flight when personal computer communication devices are allowed to communicate with distant communication systems by controlling the communications link between the first antenna in the aircraft cabin and the second antenna.

B.     **The Claims of the '858 Patent**

AMBIT asserts that Delta and Aircell each infringe all 17 claims of the '858 Patent. Claims 1, 7, and 13 are independent claims. Claim 1 is directed to a system in an aircraft for enabling communication from wireless personal computer communication devices to distant communication systems. Claims 7 and 13 are directed to a method of enabling communication between wireless personal communication devices and distant communication systems. The claims are reproduced in Appendix B with the disputed claim terms and phrases underlined.

C.     **The Prosecution History of the '858 Patent**

The United States Patent and Trademark Office ("USPTO" or "PTO") issued the '858 Patent on July 15, 2008 after a brief prosecution. Application No. 11/020,450, which issued as the '858 Patent, was filed on December 22, 2004. On October 12, 2007, the USPTO issued a first Office Action, rejecting all claims on the grounds of statutory double patenting, non-

statutory obviousness-type double patenting, and under 35 U.S.C. 102 and 103.  On December

22, 2007, the patentee amended all the claims to clarify the scope of the invention.  The USPTO

issued a first Notice of Allowability on March 28, 2008.  On April 10, 2008, the patentee

submitted a Request for Continued Examination along with an Information Disclosure Statement

to cite prior art.  The USPTO then issued a second Notice of Allowability on June 2, 2008, and

the '858 Patent issued on July 15, 2008.  See Hurwitz Decl. ¶ 3, Exhibit B.

    The '858 patent belongs to a family of related patents.  It is a division of Application No.

09/634,140, filed August 8, 2000, now U.S. Patent 6,885,845, which is a continuation of

Application No. 08/604,105, filed February 20, 1996, now U.S. Patent 6,594,471.  These two

patents were, in turn, continuations-in-part of Application No. 08/581,065, filed December 29,

1995, now U.S. Patent 5,711,014 and Application No. 08/042,879, filed April 5, 1993, now U.S.

Patent 5,493,702.[2]

## II.    GENERAL LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

    As set forth below, the overwhelming majority of the claim terms at issue should be

construed by giving the claim terms "their ordinary and customary meaning," which is "the

meaning that the term would have to a person of ordinary skill in the art in question at the time of

the invention."  *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*).  To

determine this meaning, the Court should rely on the often-cited teachings of *Phillips,* where the

Federal Circuit emphasized that "the court starts the decisionmaking process by reviewing the

same resources as would [a person having ordinary skill], *viz.,* the patent specification and the

---

[2] For the Court's consideration, the entire file history for the prosecution of the 11/020,450
Application, which issued as the '858 Patent, is attached as a separate volume to the
accompanying Hurwitz Decl. at ¶ 3, Exhibit B.  The entire file histories for the prosecution of the
related applications, listed on the face of the '858 Patent, are also included in the Hurwitz
Declaration at ¶¶4 and 6-8, Exhibits C and E-G.

prosecution history." *Phillips,* 415 F.3d at 1313.  Thus, claim construction rests primarily on

three sources of intrinsic evidence — the claims, the specification, and the prosecution history.

      As a starting point, the words of a claim are generally given their ordinary and customary

meaning — again, as understood by one of ordinary skill in the art.  *See Phillips*, 415 F.3d at

1312-13.  In many cases, "the claims themselves provide substantial guidance as to the meaning

of particular claim terms."  *Phillips,* 415 F.3d at 1314.  For example, claim terms must be

interpreted in a way that gives meaning to each word.  *Id.*  (explaining that "steel baffles" must

have a different meaning than "baffles").  In contrast, the Court's role is not to interpret whole

unparsed phrases of the patent claims for some overarching meaning or "gist."  *See O2 Micro*

*Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351,1360-1363 (Fed. Cir. 2008)

(consistently referring to a Court's duty to determine both the *meaning* and *scope* of "claim

terms" and "words"); *see also Everpure, Inc. v. Cuno, Inc.*, 875 F.2d 300 (Fed. Cir. 1989) ("there

is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of an invention").

      The specification will often provide "the single best guide to the meaning of a disputed

term."  *Phillips,* 415 F.3d at 1315.  The claims "do not stand alone" and "must be read in view of

the specification, of which they are a part."  *Id.*  "Where a specification does not *require* a

limitation, that limitation should not be read from the specification into the claims."  *Specialty*

*Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) (emphasis in original).

      Finally, the intrinsic evidence includes the prosecution history, which "[l]ike the

specification . . . provides evidence of how the PTO and the inventor understood the patent . . .

[and] was created by the patentee in attempting to explain and obtain the patent."  *Phillips,* 415

F.3d at 1317.

The Courts "may also rely on extrinsic evidence, such as technical dictionaries." *Id.* However, the extrinsic evidence is less significant than the intrinsic record in determining the legally operative meaning of claim language. *Id.* For example, technical dictionaries, particularly dictionaries from the same time when the patent application was first filed, may be used to better understand the underlying technology and the way in which one of skill in the art might use the claim terms. *Id.* at 1318. Likewise, expert testimony can be useful to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field.

For the Court's consideration, accompanying this brief is the Declaration of D. Richard Brown, Ph.D. ("Brown Decl.") to provide an understanding of claim terms from the vantage point of a person having ordinary skill in the relevant art.[3] Professor Brown is an Associate Professor at Worcester Polytechnic Institute where, among other activities, he teaches courses in Communication Systems Engineering and Advanced Computer System Design. According to Dr. Brown, in this case, a person having ordinary skill in the relevant art would have had a Bachelor of Science degree in Electrical Engineering and at least a few years of experience designing wireless communication devices and/or systems. Brown Decl. ¶ 6. In addition, for the Court's consideration, also enclosed are the file histories of the related U.S. applications to which the '858 Patent claims priority as well as pertinent items of extrinsic evidence. Hurwitz Decl. ¶¶ 3-4 and 6-8, Exhibits B-C and E-G.

---

[3] As explained in his declaration, Dr. Brown relates his understanding from the perspective of one of skill in the art, as of 1996, which is the filing date to which the '858 patent is entitled. Thus, the mention here and elsewhere of "Dr. Brown's understanding" is to be read with that
*Continued on next page*

## III.    THE DISPUTED CLAIM TERMS

### A.    The Preamble of Each Claim in the '858 Patent is Not Limiting and Does Not Add a Personal Communication Device Element or a Distant Communication System Element

A patent claim has three elements:  a preamble, a transition phrase, and the body of the claim.  The preamble to Claim 1 of the '858 Patent reads as follows:

> A system for enabling communication from personal computer communication devices located within a passenger vehicle to a distant communication system located outside of said passenger vehicle, each of said personal computer devices having a radiative RF antenna, said system comprising:

This preamble describes what the "system" of the claim is intended to do, or enabled to perform, and is not specifying required elements of that claimed system.  In particular, the use of the word "for" signals that what follows is a statement of the intended purpose of the claimed system described in the body of the claim.  Thus, the required elements of the claims follow, not precede, the traditional transition phrase "comprising."

"[T]he purpose of a claim preamble is to give context for what is being described in the body of the claim."  *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008).  In general, a preamble is only construed as a limitation "if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim."  *Id.* (quotations omitted).  "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'"  *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

---

perspective in mind.

Put another way, "preamble language merely extolling benefits or features of the claimed invention does not limit the claim scope without clear reliance on those benefits or features as patentably significant." *Catalina*, 289 F.3d at 809.

> [C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention. … Without such reliance, however, a preamble generally is not limiting when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention.

*Id.*; *see also Symantec*, 522 F.3d at 1288.

The body of each claim of the '858 Patent describes a structurally complete invention. Each claim describes all the essential parts of the invention; the first antenna, the second antenna, the control computer, the communication link, and how those parts interrelate to form the system. Nothing in the preamble is required to complete the system. Moreover, the file history shows that the preamble of each claim was not relied on during prosecution to distinguish the claimed invention from the prior art.

Claim 1 states that the claimed system is "<u>for enabling</u> communication from personal computer communication devices" (emphasis added), <u>not that the system comprises</u> such personal computer communication devices. Likewise, the claim does not recite that the system comprises a distant communication system, but merely that the intended use of the system is to enable communication between the personal computer communication devices and a distant communication system. The body of Claim 1 fully defines a system "for enabling" the communication between the personal device and the distant system, and, therefore, the personal communication devices and the distant communication system are not limitations; they are merely recited to give context for the claimed invention.

7

Moreover, one of ordinary skill in the art would understand that the claimed invention does not itself include personal computer communication devices or a distant communication system. According to Dr. Brown, the "system for enabling communications" of Claim 1 does not encompass the personal computer communication devices or the distant communication system, but does encompass the hardware and software that enables communication between the devices and the distant communication system. *See* Brown Decl. ¶¶ 18 and 19.

The Federal Circuit decision in *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289 (Fed. Cir. 2004), is instructive. There, the preamble recited "hand-held punch pliers for simultaneously punching and connecting overlapping sheet metal." The Court concluded that neither the "sheet metal" nor the "punching and connecting" language was a limitation.

Likewise, in a very recent case, *Fujifilm Corp. v. Papst*, 2009 U.S. Dist. LEXIS 49870 (D.D.C. June 12, 2009), the District Court held that a claimed device with a preamble reciting "[a]n interface device <u>for communication</u> between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device" (emphasis added) did not actually include the "data transmit/receive device" as a claim limitation. The Court held that while the "data transmit/receive device" may be construed to provide context for the claimed "interface device," it was not a claim limitation. *See Id.* The claim preamble in *Fujifilm* is similar to that found in the '858 Patent ("A system for enabling communication . . .").

The preamble of Claim 1 provides technological context and explains the intended use; it does not recite any elements of "the system" or "the method." Thus, construing the preamble as a claim limitation is improper. Likewise, the preambles of Claims 7 and 13, which are

substantially similar in language and form as the preamble of Claim 1, also should not be construed as limitations.

### B.    Personal Communication Devices

The terms **"personal computer communications device"** and **"personal computer device"** mean **"a personal computer having a communication**

**interface,"** where **"a personal computer is a private, individual electronic data processing device which is generally programmable to execute personally controllable application software,"** and where **"a communication interface provides a way for the personal computer to externally send and receive information."**

The interpretation of the above terms reflects their plain meanings, as understood by a person having ordinary skill in the art when viewed in the context of the specification. The term "personal computer" is used in its ordinary sense. The specification, at col. 1, lines 28-30, states that a hand-held electronic communication device "should [be] able to travel with its owner" and be easily transferably usable in automobiles, planes, cabs or buildings" (emphasis added). Such a device is a personal device. If the device is a computer, such as the computer mentioned at col. 4, line 16 of the specification, then the device would be a personal computer. *See also*, col. 4, lines 8-9 of the specification, which describes an embodiment of the invention that permits a communication device to be used "as a personal communicator."

Dr. Brown explains in his Declaration, that one of skill in the art would define a "personal computer" as "an electronic data processing device, designed to be used by an individual, with input and output functions, and generally programmable to execute software applications selected by the individual user" (*see* Brown Decl. ¶ 8) (emphasis added). Further, Dr. Brown states that a "personal computer communication device" is "a personal computer with

the capability of successfully transmitting and receiving information through at least one electrical or electromagnetic communication interface," such as, for example, "a personal laptop computer with a wireless network interface."  Brown Decl. ¶ 8.  One skilled in the art would appreciate that not all "portable" devices are "personal."  *See* Brown Decl. ¶¶ 9 and 11.  It is Dr. Brown's understanding that a "personal computer communication device" refers to a specific subclass of communication devices that have a personal computer.  Brown Decl. ¶ 9.  Examples of personal electronic communication devices not in this subclass include, *e.g.*, facsimile machines and pagers.  Brown Decl. ¶ 9.

The above construction is also supported by standard dictionary definitions.  The term "personal" means "intended for <u>private</u> use or use by one person."  Merriam-Webster Online Dictionary, retrieved from http://www.merriam-webster.com/dictionary/personal (emphasis added).  The term "computer" means "a <u>programmable usually electronic device</u> that can store, retrieve, and process data."  Merriam-Webster Online Dictionary, retrieved from http://www.merriam-webster.com/dictionary/computer (emphasis added).  Thus, the term "personal computer," as used in the claims, means a <u>private</u>, <u>individual electronic data processing device</u> that is generally <u>programmable</u> to execute <u>personally</u> controllable application software.  The term "communication device" means a thing for sending and receiving information.  Thus, the term "personal computer communication device," as used in the claims, are personal computers having a communication interface that provides a way for the personal computer to externally send and receive information by the claimed system.

Similarly, the terms **"radiatively communicative wireless personal RF communication devices," "wireless personal RF communication device,"** and **"personal communication device"** mean **"a personal device having a wireless RF communication**

10

**interface"** where **"a communication interface provides a way for the personal device to externally send and receive information."**

As Dr. Brown explains, the term "radiatively communicative wireless personal RF communication devices" refers to "any electronic device, designed to be used by an individual and capable of successfully transmitting and receiving information through a 'radio frequency' (RF) electromagnetic communication interface." Brown Decl. ¶ 12. Examples of such devices include, for example, "a cellular telephone and a personal laptop computer with a wireless network interface." Brown Decl. ¶ 12. The term refers to a specific subclass of communication devices that have an RF electromagnetic communication interface. Brown Decl. ¶ 13. Examples of personal electronic communication devices that fall *outside* of this subclass include, for example, a laptop computer with only a wired interface or a corded telephone. Brown Decl. ¶ 13. One skilled in the art would interpret the terms "radiatively communicative wireless personal RF communication device," "wireless personal RF communication device," and "personal communications device," as used in the claims, to mean the same thing. Brown Decl. ¶ 14.

The above construction is also supported by dictionary definitions. As already explained above, "personal" means intended for private use or use by one person, and "communication device" means a thing for sending and receiving information. The term "RF" stands for "radio frequency." Merriam-Webster Online Dictionary, retrieved from http://www.merriam-webster.com/dictionary/RF; *see also*, Brown Decl. ¶ 12. The terms "wireless" and "radiatively communicative" are used in their ordinary meanings, which are to communicate without wires, such as via electromagnetic waves. *See*, Merriam-Webster Online Dictionary, retrieved from http://www.merriam-webster.com/dictionary/wireless, defining "wireless" as "having no wire or

wires" and "operating by means of transmitted electromagnetic waves." In combination, the terms "radiatively communicative," "wireless," "personal," "RF," and "communication devices" would be understood by a person having ordinary skill to mean a personal device having an RF communication interface that provides a way for the personal device to externally send and receive information wirelessly, which is what Dr. Brown understands the above terms to mean.

### C.    The RF Antenna

The term **"RF antenna"**[4] means **"a structure for emitting and receiving electromagnetic waves at radio frequency (RF) that is in the electromagnetic spectrum between the audio frequency portion and the infrared portion."** "RF antenna" is used in all three independent claims (Claims 1, 7, and 13) and also in Claim 16. The term "RF antenna" is exemplified in the specification, *see, e.g.,* FIG. 3A (items 64 and 66) in its customary, ordinary manner. Therefore, "RF antenna" should be construed according to its ordinary meaning by a person having ordinary skill. The ordinary meaning of RF antenna is a device that transmits and receives in the radio frequency (RF) portion of the electromagnetic spectrum, which is above 300 kHz and below 100 GHz (or, said otherwise, the portion of the electromagnetic spectrum between the audio/acoustic portion and the infrared portion). *See* Brown Decl. ¶¶ 12 and 38. This definition of RF antenna is in accord with a definition proffered during prosecution of the 09/634,140 application, in which "antenna" was described as "a metallic apparatus for sending and receiving electromagnetic waves." Hurwitz Decl. ¶ 5, Exhibit D. Thus, a person having ordinary skill in the art understands the ordinary meaning of the term **"RF antenna"** to mean **"a structure for emitting and receiving electromagnetic waves at radio frequency (RF) that is**

---

[4]  The claims also use the terms "radiative RF antenna" and "RF radiative antenna." These terms have the same ordinary meaning as "RF antenna" to a person having ordinary skill. *See* Brown
*Continued on next page*

in the electromagnetic spectrum between the audio frequency portion and the infrared

portion."

### 1.    First RF Antenna

The term **"first RF antenna"** means **"a radiative RF antenna distinct from the RF**

**antennae associated with described personal communication devices and distinct from the**

**second RF antenna."**  The independent claims (Claims 1, 7, and 13) each recite "first RF

antenna."  In each independent claim, the "first RF antenna" is recited as being arranged to

wirelessly communicate an RF signal with personal communication devices.  Written

embodiments in the specification describe the structure communicating wirelessly with personal

communication devices as a "probe" or a "pickup probe" and portions of the drawing illustrate

an "antenna," and the entire system itself is referred to as an "antenna coupling system."  *See,*

*e.g.,* '858 Patent at col. 5, lines 12-14 and col. 2, line 46.  The specification describes many

embodiments in which the probe both transmits and receives RF signals, thus serving as an

antenna.  For example, in one embodiment, the "probe transmits electrical signals radiated to and

from a radiative antenna on or in the base of the portable communication device."  *See Id.* at col.

5, lines 24-27.  The pickup probe shown and described in the specification thus serves as the

claimed first antenna.  *See* Brown Decl. ¶¶ 26-27 and 39-41.  Also, during prosecution of the

parent application to the '858 Patent, which shares an identical specification, the USPTO

accepted an amendment to change "probe" to "antenna" and accepted a statement by the

inventors that a "probe is in fact an antenna . . . ."  *See* Hurwitz Decl. ¶ 5, Exhibit D.  For the

foregoing reasons, a person having ordinary skill in the art understands that a "probe" is the same

as an "antenna," and therefore that the use of "probe" in the specification does not impart a

---

Decl. at ¶¶ 39-41.

special or unique meaning on the word "antenna" in "first RF antenna."  Moreover, the

specification and the body of the claims require that the first radiative antenna is a different

antenna than the antenna found on the personal communications device and is also a different

and distinct antenna from the antenna described as the "second RF antenna."[5]  Thus, a person

having ordinary skill understands **"first RF antenna"** to mean **"a radiative RF antenna**

**distinct from the RF antennae associated with described personal communication devices**

**and distinct from the second RF antenna."**

### D.    To Communicate

The term **"to communicate"** means **"to successfully transmit information to an**

**intended receiver and vice versa."**  The term "to communicate" is used in independent Claims

1 and 7, and in dependent Claims 2 and 3.  "To communicate" is not defined in the specification

in a special or unique manner, nor should it have been necessary to do so.  The term was

intended to, and should, be construed according to its ordinary meaning.  An ordinary meaning

of "to communicate" is "to convey information."  *See* THE AMERICAN HERITAGE DICTIONARY OF

THE ENGLISH LANGUAGE (4th Ed.), *available at* http://dictionary.reference.com/browse/time.  *See*

*also* Brown Decl. ¶ 16.  It follows from this definition that in order "to communicate" (convey)

information, transmitted information must be successfully received by the intended recipient.

### E.    The Communications Link

The term **"communications link"** means **"any connection or series of connections,**

**wired or wireless, that enable communication."**

---

[5] Notably, while defendants contest AMBIT's proposed definition of the first RF antenna, they do not dispute AMBIT's definition of "second RF antenna," which is syntactically virtually identical to the phrase "first RF antenna," except for it being the "second" antenna.

In all three independent claims (1, 7, and 13), the "communications link" is "between said at least one of said first RF antenna . . . and said at least one second antenna." The term "communications link" is not defined in the specification in a special or unique manner, therefore, it should be construed according to its ordinary meaning. The ordinary meaning of "communications link" is a link that allows for communication.

All embodiments shown in the specification illustrate a structure connecting the first and second RF antennae. FIG. 1B explicitly shows a first RF antenna (item 22) connected to a transmission line (item 32) that leads to a second antenna (item 40). FIGS. 2A and 2B show the first RF antenna and a transmission line. FIGS. 3A, 3B, and 4 also show a first RF antenna connected to a second RF antenna by a transmission line and a control unit. These embodiments show that the claimed communication link "between . . . said first RF antenna . . . and . . . [said] second antenna" in the independent claims may include multiple parts.

The transmission line may be a coaxial cable, waveguide, optical fiber, or the like. *See* '858 Patent at col. 2, lines 22-23, col. 4, lines 43-44, and col. 5, line 28. Thus, a person having ordinary skill in the art would understand that parts of the communications link or the entire communications link may be wired, *e.g.*, coaxial cable, or wireless. *See* Brown Decl. ¶ 25. A person having ordinary skill in the art also understands that the transmission line may take many additional forms aside from those expressly described in the specification. *See Id.* at ¶¶ 26 and 27. For example, a person having ordinary skill understands that the communications link is not limited to a simple cable that directly conveys RF signals. *See* Brown Decl. ¶ 27. The specification explains that embodiments may include a frequency converter, a heterodyne converter, and/or a modulator. *See* '858 Patent at col. 5, lines 8, 32-33, and 38. Thus, a person having ordinary skill in the art understands that the RF signals that the first and second antennae

15

provide may be converted to a different format for transmission over at least a part of the communications link between the first and second antennae.

For the foregoing reason, a person having ordinary skill in the art understands the term "communications link" to mean **"any connection or series of connections, wired or wireless, that enable communication."**

### F.     The Control Computer

The term **"control computer"** means **"a data processing device that exercises restraint or directly influences some other device."** A "control computer" is explicitly recited in independent Claims 1, 7, and 13 and dependent Claims 2-4 and 8-9. The ordinary meaning of "control computer" is an electronic data processing device that controls (*i.e.*, influences) the behavior of a system or device. To facilitate control, such a computer typically monitors or measures one or more aspects of the state of operation of the system or device under its control and uses these measurements to generate appropriate control signals. *See* Brown Decl. ¶ 21.

The specification of the '858 patent refers to a "control unit" that "may comprise a filter or a switch connected to a computer" (col. 2, lines 43-44) and states that "the control unit 60 may comprise a filter, switch, amplifier, attenuator, combiner, splitter, or other type of frequency converter, connected to a computer 68" (col. 5, lines 6-9). The term "control computer" as used in the claims thus refers specifically to a computer component of a control unit.  *See* Brown Decl. ¶ 22. This computer may be physically separate from the rest of the control unit (as in FIGS. 3A and 3B) or they may be packaged together (as in FIG. 4).

The control computer has various functions which include monitoring or controlling the time in a vehicle in which the personal communication devices may be utilized in an airplane. *See, e.g.,* '858 Patent col. 3, lines 5-7 and col. 5, lines 35-37.  Other possible functions of the

control computer include "permit[ting] regulation of signals being transmitted through the

transmission line," "permit[ting] multiple simultaneous use of the transmission line," and/or

"billing any users of the communication and/or remote antenna by monitoring and tabulating any

signals received by and sent through the control unit." *See* '858 Patent col. 3, lines 4-5 and 35-

46 and col. 5, lines 8-13. *See also* Brown Decl. ¶ 23. In the context of the above-quoted

passages in the '858 patent specification, the "transmission line" is a component of the

"communication link" (defined in more detail in the next section below) that provides the only

way for communication signals within a passenger vehicle, such as a local environment of an

aircraft, to be conveyed to the second RF antenna. A control computer in this context thus can,

among other functions, selectively enable, restrict, or regulate the ability of communication

signals to pass through to the second RF antenna, and thus enables intelligent use of the

"communication link" to which it is attached. *See* Brown Decl. ¶¶ 29-30.

> 1.     **"Arranged to Control a Communications Link" or "Operating a Control Computer in a Communications Link" or "Placing a Control Computer in a Communications Link"**

The phrase **"arranged to control a communications link"** means **"connected to affect**

**the ability to transmit information between two or more points."** The phrase "arranged to

control a communications link" in independent Claim 1 (and similar language in Claims 7[6] and

13[7]) is not defined in the specification in a special manner. However, the claims and the

specification consistently describe the control computer being coupled to a communications link.

The independent claims state that the control computer is "arranged to control a communications

link" (Claim 1 at col. 5, lines 62-63) or is "in a communications link" (Claim 7 at col. 6, line 38

and Claim 13 at col. 7, line 25). Also, the specification consistently describes the control

---

[6]  Independent Claim 7 recites ". . . operating a control computer in a communications link . . . ."

computer (control unit) as being coupled to or a part of the transmission line (communications link).  *See, e.g.,* col. 3, lines 5-6 and col. 5, line 4.  Thus, a person having ordinary skill in the art understands that a control computer is coupled to or part of a communications link.  It necessarily follows that the control computer exerts control over the communications link.  *See* Brown Decl. ¶ 30.

### 2.    "Control Use and Time"

The phrase **"control use and time"** means **"control periods during which it is made possible for the personal computer communication devices to communicate with the distant communications system."**  The phrase "control use and time" in independent Claim 1 (and similar language in independent claims 7[8] and 13[9]) is not defined in the specification in a special manner.  However, the specification describes several example embodiments that are illustrative of the ordinary meaning to the terms "use" and "time" to a person having ordinary skill in the art.

As explained above in Section III.E, every embodiment described in the specification has first and second RF antennae connected by a communications link.  A person having ordinary skill thus understands that communications from personal communication devices through use of the claimed system are routed between these antennae, and thus through the communications link, to reach a distant communication system.  *See, e.g., Id.* at col. 3, lines 13-17.  It follows that such communication can, for example, be disabled by turning off the communications link.[10]  As

---

[7]  Independent Claim 13 recites ". . . placing a control computer in a communications link . . . ."

[8]  Independent Claim 7 recites ". . . limiting the time said variety of different radiatively communicative wireless personal RF communication devices may be utilized to communicate . . . ."

[9]  Independent Claim 13 recites ". . . limiting the time said RF signals are sent . . . ."

[10]  Even if the communications link is turned off, the personal communications device may still transmit and the first RF antenna may receive the transmission.  But the transmission received by the first RF antenna is not passed by the communications link to the second RF antenna, and therefore is not radiated outside of the aircraft to reach the distant communication system.  Thus, ***Continued on next page***

described above, a person having ordinary skill in the art understands that the control computer controls use by controlling the communications link.  *See* Brown Decl. ¶ 34.

The word "time" has many different customary, ordinary definitions, one being length of time.  Another definition for time is "an interval designated for a given activity that can be defined by events.  *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th Ed.), *available at* http://dictionary.reference.com/browse/time.  *See also* Brown Decl. ¶ 33.  The specification supports construing "time" to include this second definition, stating that a control unit may "control the time in the vehicle in which the communication device may be utilized, for example, to limit certain times when such devices may be utilized in an airplane."  '858 Patent at col. 5, lines 35-38.  This example control unit described in the specification uses events occurring during an aircraft flight to designate an interval for a given activity.  Thus, "time" should be construed to include an interval that can be defined by events.  For the foregoing reasons, a person having ordinary skill in the art understands the phrase **"control use and time"** to mean **"control periods during which it is made possible for the personal computer communication devices to communicate with the distant communications system."**

       3.        **"To Bill for the Time" and "Bill for Use"**

The phrase **"to bill for the time"**[11] means **"to charge money for the use of the system."**  The phrase "to bill" has its ordinary meaning:  "to charge money."  As described in Section III.F.2, the word "time" should be construed to include meaning "an interval that is defined by events."  It therefore follows that "time," in the context of "to bill for the time," includes meaning to charge money to a user for using the system.

---

when the communications link is turned off, the personal communication device is not allowed to communicate with the distant communication system.

[11]  The claims also use the phrase "bill for use."  This phrase has the same ordinary meaning as
***Continued on next page***

4. **"Filter or Switch Communication" and "Filtering said RF Signals"**

The terms **"filter or switch communication"** and **"filtering said RF signals"** mean **"to separate communications based on specified criteria or to selectively make or break connections."**

The specification states at col. 5, lines 6-8 that "[t]he control unit 60 may comprise a filter, switch, … connected to a computer 68" and states at col. 5, lines 32-39, that "filters, switches, or the like, may be arranged in communication with the transmission line 78 to monitor or control the time in the vehicle in which the communication device may be utilized … or to modulate the signal being transmitted or received." The terms "filter" and "switch" are used in their ordinary meaning. The plain meaning of the term "switch" is "<u>making</u>, <u>breaking</u>, or changing the <u>connections</u> in an electrical circuit." Merriam-Webster Online Dictionary, retrieved from http://www.merriam-webster.com/dictionary/switch (emphasis added). The plain meaning of the term "filter" is "suppressing or minimizing waves or oscillations of certain frequencies," "holding back elements or modifying the appearance of something," or "sorting or blocking access." Merriam-Webster Online Dictionary, retrieved from http://www.merriam-webster.com/dictionary/filter. Because the filter or switch described in the specification may be used to control the time that a communications device may be used, the term "filter or switch communication," as recited in the claims, means to either make or break connections between the communication device and the claimed system, or to separate communications based on some criteria.

This construction set forth above is further supported by the knowledge of one skilled in the art. Dr. Brown states that the term "filter or switch communication" refers to "the action of

---

"to bill for the time" to a person having ordinary skill in the art.

selectively allowing all, some, or none of the personal communication devices … to successfully communicate with the distant communication network." Brown Decl. ¶ 50. Dr. Brown further explains that the filtering/switching can be <u>based on a variety of criteria</u>, such as frequency of a signal, according to certain times in an airplane or time of use, or based on a payment. Brown Decl. ¶¶ 51 and 52.

Therefore, the terms **"filter or switch communication"** and **"filtering said RF signals"** should appropriately be interpreted to mean **"separating communications based on specified criteria or to selectively make or break connections."**

### 5. "Regulating Use of"

The phrase **"regulating use of"** means **"directing, according to one or more rules, the use of a communications link."** "Regulating use of" is used in dependent Claim 9. The term is not described in the specification in a unique or special manner, so it should be construed according to its ordinary meaning. A common ordinary meaning of "regulating" is "to control or direct according to rule, principle, or law." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th Ed.), *available at* http://dictionary.reference.com/browse/regulate. As described above in Section III.F.2, "use" with respect to personal communication devices means using the claimed system to communicate with a distant communication system.

### G. RF Signal

The term **"RF signal"** means **"radio frequency electromagnetic waves between the audio-frequency portion and the infrared portion of the electromagnetic spectrum."** The term "RF signal" is used in all three independent Claims (Claims 1, 7, and 13) and also in dependent Claims 6, 8, and 14. The acronym RF is commonly understood by persons having ordinary skill in the art to mean "radio frequency." The specification supports the use of this

common meaning by using "RF" as the acronym for the term "radio frequency" that appears in the preceding sentence. *See* '858 Patent at col. 1, lines 22-26. Although some variation in the cited range exists, "radio frequency" is generally defined in the computer and electrical arts as "[t]he portion of the electromagnetic spectrum between approximately 300 kHz and 100 GHz." *See* Brown Decl. ¶¶ 12 and 38. A person having ordinary skill in the art understands RF to exclude acoustic frequencies (at the low end of the electromagnetic spectrum, below the RF portion) and infrared frequencies (at the higher end, above the RF portion). The specification supports this common meaning of "RF" by identifying example devices that use radio frequency waves to communicate, such as cellular telephones and pagers. No person having ordinary skill in the art would expect these types of devices to communicate with a distant communication network via sound or infrared light. Also, in the claims, "RF signal" is always described as "wireless." Thus, a person having ordinary skill understands such a signal to be a radiated electromagnetic field, instead of an electrical signal traveling on a wire.

For the foregoing reasons, a person having ordinary skill understands **"RF signal"** to mean **"radio frequency electromagnetic waves between the audio-frequency portion and the infrared portion of the electromagnetic spectrum."**

### H.    RF Signal Shield

The terms **"RF signal shield," "shielding," "RF signal shielded area,"** and **"RF shielding"** mean **"anything that attenuates electromagnetic fields in certain directions of propagation."**

This interpretation is supported by the specification, which recites at col. 2, lines 58-61, that "[t]he shield may be comprised of an electrically conductive material, or an <u>attenuative material</u> capable of blocking at least part of the radio frequency radiation energy coming from

22

the communication device(s)" (emphasis added).  According to one disclosed embodiment at col.

4, lines 28-32, of the specification, a shield may be "placed on/in [a] desk 14, (or room, vehicle

or building, as shown in FIGS. 3*a* and 3*b*), to prevent the radiation (electromagnetic/microwave)

emanating from [a] communication device 12 from traveling in any undesired directions within

the desk, room, vehicle or building" (emphasis added).  Thus, the interpretation of the terms as

meaning "anything that attenuates electromagnetic fields in certain directions of propagation" is

consistent with the specification.

This construction is also supported by extrinsic evidence, such as dictionaries and the

knowledge of one skilled in the art.  The 1993 IEEE Dictionary, at page 1209, defines a "shield"

as being "[a] housing, screen, or other object, usually conducting, that substantially reduces the

effect of electric or magnetic fields on one side thereof, upon devices or circuits on the other

side" (emphasis added).  Hurwitz Declaration ¶ 11, Exhibit J.  Further, Dr. Brown states that a

shield is "a structure, usually electrically conductive, which attenuates electromagnetic fields in

the radio frequency (RF) spectrum" (emphasis added) and that in the context of the patent, one of

skill in the art would understand that "the shield could take on a variety of embodiments

including … a room, a vehicle, an airplane, or an entire building."  Dr. Brown additionally notes

that such a shield "may attenuate only part of the radiated signal and that some of the signal may

pass through the shield."  Brown Decl. ¶¶ 44 and 45.

Therefore, the terms **"RF signal shield," "shielding," "RF signal shielded area,"** and

**"RF shielding"** should be appropriately interpreted to mean **"anything that attenuates**

**electromagnetic fields in certain directions of propagation."**

## I.    Local RF Restricted Environment

The term **"local RF restricted environment"** in Claims 13-16 should be interpreted as **"an automobile, building, elevator, airplane, or desk, to or from which entering or escaping RF energy is attenuated."**  The latter quoted terms are part of a "Markush" group, which recites "local RF restricted environment, which environment is selected from the group consisting of: an automobile, a building, an elevator, an airplane, or a desk."  *See generally, Abbott Labs v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003) ("A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C.").  A Markush group is self-defining; that is, the local RF restricted environment is defined as a member selected from the group consisting of: an automobile, building, elevator, airplane, or desk.  Additionally, because the specification at col. 2, line 59-60 describes "attenuative material" as being "capable of blocking at least part of the radio frequency radiation energy," it should be understood that the term "RF restricted" refers to attenuating RF energy.

Given the Markush group nature of the term, and because the specification describes blocking at least some RF energy to be attenuating RF energy, the entire term "local RF restricted environment" should be understood to be "an automobile, building, elevator, airplane, or desk, to or from which entering or escaping RF energy is attenuated."  This is also the understanding of one skilled in the art, as explained by Dr. Brown, who identifies the term as referring to "an environment, e.g. 'an automobile, a building, an elevator, an airplane, or a desk' … in which radio frequency communication signals are at least partially restricted from propagation in one or more directions outside of the environment by a shield or other attenuating material."  Brown Decl. ¶ 46.

## IV.     CONCLUSION

For the foregoing reasons, AMBIT respectfully requests that the Court accept its

proposed claim constructions.

Respectfully Submitted,

August 4, 2009                         HAMILTON, BROOK, SMITH & REYNOLDS, P.C.


/s/ Brian T. Moriarty
Brian T. Moriarty (BBO# 665995)
brian.moriarty@hbsr.com
David J. Thibodeau, Jr. (BBO# 547554)
david.thibodeau@hbsr.com
David J. Brody (BBO# 058200)
david.brody@hbsr.com
Benjamin P. Hurwitz (BBO# 666337)
benjamin.hurwitz@hbsr.com
530 Virginia Road
P.O. Box 9133
Concord, Massachusetts 01742-9133
Telephone:  (978) 341-0036
Facsimile:  (978) 341-0136

GESMER UPDEGROVE, LLP
Lee T. Gesmer (BBO# 190260)
lee.gesmer@gesmer.com
Joseph J. Laferrera (BBO# 564572)
joe.laferrera@gesmer.com
40 Broad Street
Boston, Massachusetts  02109
Telephone:    (617) 350-6800
Facsimile:     (617) 350-6878

*Attorneys for Plaintiff*

## APPENDIX A

### Uncontested and Agreed-Upon Claim Terms

As required by the Court's Case Management Scheduling Order (D.I. #31), Ambit proposed definitions for a series of claims terms on July 14, 2009.  Defendants Aircell and Delta have not proposed a corresponding definition for many of these terms in their initial or amended claim disclosures and have not done so since.  Ambit's proposed construction of these uncontested terms is consistent with the specification and the plain meaning of the term as used in the patent and by a person having ordinary skill in the art.  Defendants have offered no comments or objections on these proposed definitions. Set forth below is a list of uncontested terms, each of which should be accepted by the Court because Ambit's proposed definitions are not contested by Defendants and represent the ordinary meaning of the terms.  *Cf. O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, Ltd., 521 F.3d 1351 (Fed. Cir. 2008) (courts may rely on ordinary meaning and need not construe undisputed terms).  Should Defendants belatedly propose contrary definitions of these terms, Ambit reserves its rights to object and contest such definitions.

|    | Uncontested Term | Ambit's Proposal | Defendants'  Proposal |
|----|------------------|------------------|----------------------|
| 1. | Located within a passenger vehicle; Arranged within said passenger vehicle; Within a local environment in an aircraft | Inside an aircraft capable of carrying people. An aircraft is any machine supported for flight in the air by buoyancy or by the dynamic action of air on its surfaces, especially powered airplanes, gliders, and helicopters. | No proposed definition |
| 2. | A distant communication system | A remotely located communication system. | No proposed definition |

26

| 3. | Second RF antenna | A radiative RF antenna distinct from the RF antennae associated with described personal communication devices and distinct from the first RF antenna | Defendants assert a construction for a whole claim element that includes the word "second RF antenna," but merely repeat the words "second RF antenna" in the proposed construction. Thus, AMBIT's proposed construction of "second RF antenna" should be accepted. |
|---|---|---|---|
| 4. | Each | Every one of two or more considered distinctly from the rest. | No proposed definition |
| 5. | Having | Contain as a constituent part. | No proposed definition |
| 6. | At least | At a minimum. | No proposed definition |
| 7 | Arranged to radiate outside of said passenger vehicle | Emits RF electromagnetic waves outside of the aircraft. | No proposed definition |
| 8. | Aircraft<br><br>Airplane | An aircraft is any machine supported for flight in the air by buoyancy or by the dynamic action of air on its surfaces, especially powered airplanes, gliders, and helicopters. | No proposed definition |
| 9. | To bill for the time<br><br>Bill for use | To charge money for use of the system. | No proposed definition |
| 10. | Monitoring | Keeping track of. | Defendants assert a construction for a whole claim element that includes the word "monitoring," but merely repeat the word "monitoring" in the proposed construction. Thus, AMBIT's proposed construction of "monitoring" should be accepted. |
| 11. | A satellite | A communications satellite. | No proposed definition |
| 12. | Variety of different | An assortment. | No proposed definition |

27

| 13. | Laptop computer<br><br>Personal laptop computer | A portable personal computer. | No proposed definition |
|-----|-----|-----|-----|
| 14. | Spaced-apart and non-touching | Physically separate. | No proposed definition |
| 15. | RIF | "RIF" is a clear typographical error (made by the United States Patent and Trademark Office) that is supposed to read "RF." This error is also readily apparent to one skilled in the art. | No proposed definition |
| 16. | Plurality | Two or more | Two or more |

## APPENDIX B

The '858 Patent contains 17 claims. AMBIT asserts that Delta and Aircell each infringe all 17 claims. Claims 1, 7, and 13 are independent claims. The claims of the '858 Patent are set forth below and the disputed preamble and claim terms and phrases are underlined.

1.    A system for enabling communication from <u>personal computer communication devices</u> located within a passenger vehicle to a <u>distant communication system</u> located outside of said passenger vehicle, each of said <u>personal computer devices</u> having a radiative <u>RF antenna</u>, said system comprising:

       at least one <u>first RF antenna</u> arranged within said passenger vehicle <u>to communicate</u> an <u>RF signal</u> wirelessly with said <u>personal computer communication devices</u>;

       at least one second <u>RF antenna</u> arranged to radiate outside of said passenger vehicle to wirelessly communicate with said <u>distant communication system</u> located outside of said passenger vehicle;

       a <u>control computer</u> <u>arranged to control a communications link</u> between said at least one of said first <u>RF antenna</u> within said passenger vehicle and said at least one second <u>RF antenna</u> arranged to radiate outside of said passenger vehicle, said <u>control computer</u> arranged to <u>control use and time</u> in which said <u>personal computer communication devices</u> are enabled to communicate with said <u>distant communication system</u> outside of said passenger vehicle, wherein said passenger vehicle is an aircraft.

2.    The system as recited in claim 1, wherein said <u>control computer</u> operates to <u>filter or switch communication</u> of said <u>personal computer communication devices</u> within said passenger vehicle and said distant communication system outside of said passenger vehicle.

3.    The system as recited in claim 1 wherein said <u>control computer</u> operates to control the time said <u>personal computer communication devices</u> are enabled to wirelessly <u>communicate</u> by RF communication through said system, and <u>to bill for the time</u> said

personal computer communication devices are communicatively enabled within said passenger vehicle.

4.      The system as recited in claim 1, wherein said control computer enables the monitoring of wireless RF communication between said personal computer communication devices within said passenger vehicle and said distant communication system.

5.      The system as recited in claim 1, wherein said distant communication system comprises a satellite.

6.      The system as recited in claim 1, wherein said passenger vehicle has an RF signal shield arranged therein to restrict undesired travel of a wireless RF signal transmission within said passenger vehicle.

7.      A method of utilizing a variety of different radiatively communicative wireless personal RF communication devices within a local environment in an aircraft, in RF communication with a communication system distant from said local environment, comprising:

        arranging at least one first RF antenna within said local environment;

        arranging at least one second RF antenna radiating outside of said passenger vehicle defining said local environment;

        operating a control computer in a communications link between said at least one said first RF antenna within said local environment and said at least one second RF antenna arranged to radiate outside of said local environment;

        wirelessly communicating RF signals between a radiative RF antenna of said variety of personal communication devices and said at least one first RF antenna;

        controlling said RF signals sent between said variety of different radiatively communicative wireless personal RF communication devices within said local environment and said second RF antenna radiating outside of said local environment, by said control computer; and

limiting the time said variety of different radiatively communicative wireless personal RF communication devices may be utilized to communicate wirelessly by an RF signal, from within said local environment of said aircraft to said at least one second RF antenna radiating outside of said local environment.

8.  The method as recited in claim 7, including: filtering said RF signals sent between said radiatively communicative wireless personal RF communication devices within said local environment and said second RF antenna radiating outside of said local environment, by said control computer.

9.  The method as recited in claim 7, including: regulating use of multiple wireless personal RF communication devices located within said local environment, by said control computer.

10. The method as recited in claim 7, including: shielding at least a portion of said local environment to restrict undesired travel of wireless RF signals within said local environment.

11. The method as recited in claim 7, wherein said at least one of said variety of different radiatively communicative wireless RF communication devices utilized within said local environment, comprises a laptop computer.

12. The method as recited in claim 7, wherein said local environment comprises at least a partially RF signal shielded area.

13. A method of utilizing a variety of different radiatively communicative wireless personal RF communication devices within a local RF restricted environment, which environment is selected from the group consisting of: an automobile, a building, an elevator, an airplane or a desk, so as to enable RF signal communication between said different radiatively communicative wireless personal RF communication devices with a communication system distant from said local environment, the method comprising:

31

arranging at least one first RF antenna within said local RF restricted environment;

arranging at least one second RF antenna radiating outside of said local RF restricted environment;

placing a control computer in a communications link between said at least one said first RF antenna within said local RF restricted environment and said at least one second RF antenna radiating outside of said local RF restricted environment;

wirelessly communicating wireless RF signals between an RF radiative antenna of said personal communication devices and said at least one first RF antenna, in a spaced-apart and non-touching manner;

controlling said RIF signals and limiting the time said RF signals are sent between said variety of different radiatively communicative wireless personal RF communication devices within said RF restricted environment and said second RF antenna radiating outside of said RF restricted environment, by said control computer.

14. The method as recited in claim 13, including: RF shielding at least a portion of said local RF restricted environment to control undesired travel of any of said wireless RF signals communicated within said local RF restricted environment.

15. The method as recited in claim 13, including: billing for use of any of said variety of different radiatively communicative RF communication devices utilized within said RF restricted environment.

16. The method as recited in claim 13, including: arranging a plurality of first RF antennae within said local RF restricted environment.

17. The method as recited in claim 13, wherein at least one of said radiatively communicative wireless personal RF communication devices is a personal laptop computer.

911723_1

32