IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMBIT CORPORATION,

                        Plaintiff,

v.

DELTA AIR LINES, INC., AND
AIRCELL LLC,

                        Defendants.

CIVIL ACTION NO. 1:09-CV-10217-WGY

JURY TRIAL DEMANDED

## DEFENDANTS' REPLY CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT .........................................................................................................1

    A.    Plaintiff Inaccurately Portrays Its Alleged Invention. ...............................1

    B.    Plaintiff's Approach To Claim Construction Is Contrary To Law. ............3

    C.    Plaintiff's Allegedly Uncontested Claim Terms Are, In Fact, Contested. ..............4

    D.    The Specific Claim Construction Disputes. ..............................................5

        1.    The Claims Indisputably Require Personal Communication
            Devices and a Distant Communication System Because They
            Appear in the Claim Bodies. ..........................................................5

        2.    The Preambles Are Claim Limitations and Require That the
            Personal Communication Devices Are Allowed To Transmit RF
            Signals To and Receive RF Signals From a Distant
            Communication System. ..................................................................7

        3.    Plaintiff's Constructions For The Terms Requiring Personal
            Communication Devices Inject Ambiguity and Are Not Supported
            By The '858 Patent. ........................................................................9

            a.    "Personal" devices do not have to be owned by their user. .............9

            b.    "Personal computer communication devices" are not
                limited to personal computers. ......................................................10

        4.    The "Radiative RF Antenna" On The Personal Devices Is External. ........11

        5.    The "First RF Antenna" Is a Probe Juxtaposed With The Radiative
            RF Antenna Of a Personal Communication Device. ...............................11

        6.    The "Communications Link" Is a Hard-Wired Transmission Line. ..........12

        7.    The Terms "Control Computer," "Control a Communications
            Link" and "Controlling Said RF Signals" Are Indefinite. ........................13

        8.    Whatever the "Control Computer" Is, It Is Located Within The
            Vehicle or Other Local Environment. ..........................................14

        9.    "To Communicate" Should Not Be Construed In Isolation. ....................15

10.    "Use" and "Time" Do Not Mean The Same Thing. ...................................16

11.    Claims 7 and 13 Require RF Signals To Be Traveling Between
       Personal Communication Devices and the Second RF Antenna. ..............17

12.    Plaintiff's Construction of "RF Signal" Is Incorrect. ................................17

13.    Every Automobile, Building, Elevator, Airplane and Desk Is Not
       An "RF Restricted Environment." .............................................................18

14.    The "Shield" Does More Than Attenuate RF Signals; It Restricts
       Them. .........................................................................................................19

15.    "Filter" and "Switch" Are Not the Same Thing. .......................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*British Telecommunications PLC v. Prodigy Communications Corp.*,
    217 F. Supp. 2d 399 (S.D.N.Y. 2002) ...................................................................................6

*Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002) .....................................................................................6, 7, 8

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*,
    222 F.3d 951 (Fed. Cir. 2000) ...................................................................................15

*In re Papst Licensing GMBH & Co.*,
    2009 U.S. Dist. LEXIS 49870 (D.D.C. June 12, 2009)......................................7, 8, 9

*Intirtool, Ltd. v. Texas Corp.*,
    369 F.3d 1289 (Fed. Cir. 2004) ...................................................................................8

*Koito Mfg. Co. v. Turn-Key-Tech, L.L.C.*,
    234 F. Supp. 2d 1139 (S.D. Cal. 2002)......................................................................6

*Network Commerce, Inc. v. Microsoft Corp.*,
    422 F.3d 1353 (Fed. Cir. 2005) ...................................................................................4

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .............................................................3, 4, 7, 16

**STATUTES**

35 U.S.C. § 112............................................................................................................6, 13

## I.   **INTRODUCTION**

Defendants Delta Air Lines, Inc. and Aircell LLC (collectively "Defendants") submit this memorandum in further support of their proposed constructions for the asserted claims of U.S. Patent No. 7,400,858 ("the '858 patent"). As explained below, the Court should adopt Defendants' proposed constructions, which are in keeping with the language of the claims, the specification and the prosecution history of the '858 patent. The Court should reject Plaintiff's proposed constructions, which are based primarily on the *ipse dixit* of its expert and dictionary definitions of claim terms, both of which are at odds with the teachings of the '858 patent.

## II.   **ARGUMENT**

### A.   **Plaintiff Inaccurately Portrays Its Alleged Invention.**

Plaintiff conclusorily asserts that its invention is merely having a first antenna in an aircraft (or other specified environment) that is used to pick up wireless RF signals from personal communication devices, a second antenna that is used to retransmit the signals to a distant communication system, and a communications link and control computer connecting the two antennas. (Dkt. No. 43, Pl. Br. at 2.) According to Plaintiff, neither the personal communication devices nor the distant communication system are part of the claimed inventive systems. (Pl. Br. at 6-9.) Plaintiff states that the control computer is used to control the use and time in which the personal devices are enabled to communicate with the distant communication system. (Pl. Br. at 2.) But, according to Plaintiff's expert, the control computer merely "must be programmed to control something." (Dkt. No. 45, Brown Decl. ¶ 24.)

Notably, Plaintiff describes its invention **without citing the specification at all** – and, not surprisingly, the bare bones system described by Plaintiff also describes prior art systems that were before the United States Patent and Trademark Office ("the PTO") during prosecution.[1]

---

[1] For example Figure 2 in Casewell, "The Provision of GSM Cellular Radio Environments Within Passenger Aircraft Operating Over Europe," *IEEE Fifth Int'l Conference on Mobile Radio and Personal Communications* (1989) at p. 176, shows an antenna inside an aircraft, an antenna outside the aircraft and an "aeronautical transponder" between the two antennas that includes, *inter alia*, a "controller." (Declaration of Stephanie P. Koh in Support of Defendants'

Moreover, the PTO concluded during the prosecution of related U.S. Patent No. 6,594,471 (which is incorporated by reference in the '858 patent ('858 patent, 1:7-16)) that having a control computer that monitors use or time was not novel:

> As to claims 7-8 and 15, the examiner takes an official notice that the telephone system having a control unit for monitoring the time usage for billing purposes is notoriously well known in the art. Therefore, it would have been obvious to one of ordinary skill in the art to have the control unit as claimed in order to further expand its application.

'471 patent prosecution, Feb. 3, 1998 Office Action at 5 (Koh Reply Decl. Ex. 3).[2]  Against this backdrop, it is readily apparent that Plaintiff's litigation inspired characterization of its invention cannot be correct.[3]

In truth, the alleged invention is consistently described in the specification as a "docking system" with a "shield" that can be used in a communication system with a personal communication device, such as a cellular telephone or personal computer, to avoid the allegedly unwanted propagation of RF radiation in an environment such as an airplane.  As Defendants have previously explained, this is done through three inter-related features of the alleged invention.  First, the portable device itself is shielded to restrict the transmission of radiation into the environment.  *See, e.g.,* '858 patent, 2:4-20; 2:28-32; 2:51-54; 3:16-20; 3:26-30; 4:29-38; 4:56-67 (Dkt. No. 42, Koh Opening Decl. Ex. 1).  Second, there is a juxtaposed probe to sense

---

Reply Claim Construction Brief ("Koh Reply Decl.") Ex. 1, submitted concurrently herewith). Similarly, Figure 2 in prior art U.S. Patent No. 5,519,761 ("the '761 patent") shows a repeater 210 "having an antenna, that is located in the aircraft." '761 patent, 2:54-55 (Koh Reply Decl. Ex. 2).  "The repeater (210) receives the signals from the individual radiotelephones (205) within the aircraft and relays them to an antenna (215) mounted on the outside of the aircraft.  The outside antenna (215) relays the signals to the base station on the ground." *Id.* at 2:59-63.

[2] The claims pending when the examiner made this statement in the prosecution of the '471 patent required, *inter alia*, a "docking system" with a transmission line with a control unit therein, "wherein said control unit comprises a computer arranged to monitor time or use of said docking system." '471 patent prosecution, Feb. 20, 1996 Application at 14, 16 (setting forth pending claims 7, 8 and 15) (Koh Reply Decl. Ex. 4).  Therefore, the examiner's statement was not directed merely to the obviousness of using a computer to bill for services – it was directed to having a control computer control "use and time."

[3] The '858 patent was prosecuted by a different examiner than the '471 patent and the patentee never made the '858 patent examiner aware of the previous examiner's official notice regarding the obviousness of the control computer.

2

the RF signals generated by the portable device. *See, e.g., id.* at 1:62-2:2; 2:10; 2:15-18; 2:21-23; 2:35-37; 2:54-58; 3:20-26; 4:34-36; 4:62-67; 5:22-27.  And third, the probe transmits the RF signals along a transmission line, which confines the radiation, and the transmission line, in turn, transfers the RF signals to an antenna located outside of the local environment or vehicle. *See, e.g., id.* at 1:62-2:3; 2:21-23; 2:54-58; 3:20-26; 4:41-48; 4:67-5:2; 5:24-31; *see also* Declaration of William R. Michalson ("Michalson Decl.") ¶¶ 5-6, submitted concurrently herewith.  Although the claims are not directed to the allegedly inventive "docking system" with a "shield," elements such as the "juxtaposed probe" and "transmission line" find their way into the claims through the terms "first RF antenna" and "communications link."  Plaintiff argues for an expansive interpretation of its claims that would read even these aspects of the invention out of the claims.  Plaintiff's attempt to entirely divorce its claims from its alleged invention should be rejected.

**B.    Plaintiff's Approach To Claim Construction Is Contrary To Law.**

Plaintiff pays lip service to the current law regarding claim construction but fails to follow the approach mandated by the law it cites.  For example, Plaintiff correctly states that the "claims themselves provide substantial guidance as to the meaning of particular claim terms" and that the "specification will often provide the single best guide to the meaning of a disputed term." (Pl. Br. at 4 (internal quotation omitted).)  But instead of focusing on the claims and the specification, Plaintiff repeatedly asserts that its claim constructions should be adopted based on dictionary definitions and the declaration of its expert, Dr. Brown.

Plaintiff is in essence following the pre-*Phillips* approach to claim construction, which placed heavy emphasis on extrinsic evidence.  Although the Federal Circuit has explained that dictionaries may be useful in claim construction, they are not the primary source for determining the meaning of claim terms. *Phillips*, 415 F.3d at 1314-15.  Moreover, as the Federal Circuit has explained, while expert testimony may be useful for a variety of limited purposes, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc).  In fact, expert

testimony should be disregarded where, as in Dr. Brown's declaration, the conclusions are not supported "with any references to industry publications or other independent sources." *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1361 (Fed. Cir. 2005).

Further, "a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history." *Phillips*, 415 F.3d at 1318 (quotation omitted); *see also, e.g., Network Commerce*, 422 F.3d at 1361 ("[E]xpert testimony at odds with the intrinsic evidence must be disregarded."). The Federal Circuit has stressed that extrinsic evidence is generally "less reliable than the patent and its prosecution history in determining how to read claim terms" because, *inter alia*, it can "be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of the patents." *Phillips*, 415 F.3d at 1318-19. As explained in detail below, this is precisely what Plaintiff repeatedly attempts to do through Dr. Brown's declaration.

The Federal Circuit has also emphasized that the bias inherent in expert testimony "at the time of and for the purpose of litigation" is "exacerbated if the expert is not subject to cross-examination," as in the present case. *Id.* at 1318.[4] And many of Dr. Brown's statements are incorrect, as explained in the accompanying Declaration of Dr. William Michalson. In contrast to Dr. Brown's opinions, Dr. Michalson's opinions are grounded both in the intrinsic record and in industry publications or independent sources.

### C.    Plaintiff's Allegedly Uncontested Claim Terms Are, In Fact, Contested.

As explained in Defendants' opening brief, Plaintiff has proposed constructions for a large number of common English words that do not require construction. Contrary to Plaintiff's listing of allegedly "uncontested" constructions, Defendants have never agreed or consented to

---

[4] Defendants proposed a plan by which both Dr. Brown and Defendants' expert, Dr. William Michalson, could be deposed with only a two-week extension of the *Markman* briefing schedule. Plaintiff refused to consent to this proposal.

Plaintiff's proposed constructions for these terms. In fact, Defendants' claim construction disclosure statement makes clear that the omission of these terms from Defendants' list of claim terms to be construed "should not be construed as an agreement that any of the missing terms are properly construed as Plaintiff proposes or an agreement that any of the missing terms require construction by the Court." Koh Opening Decl. Ex. 2 at 1.

Notably, Defendants have proposed constructions for a number of large claim phrases, while Plaintiff has proposed constructions for only a few words in such phrases. Under Plaintiff's logic, Plaintiff should be deemed to have consented to the portions of Defendants' constructions that Plaintiff has not specifically disputed. No doubt Plaintiff would disagree with such a proposition; its assertion that Defendants have agreed to its constructions is equally without merit.

As explained in Defendants' opening brief, Plaintiff's constructions of certain terms for which Defendants proposed no constructions would only serve to confuse the jury; and many of Plaintiff's constructions are just plain wrong. For example, the Court should reject Plaintiff's contention that the terms "aircraft" and "airplane" mean the same thing as well as Plaintiff's attempt to read the word "communications" into the clear term "a satellite."[5]

### D. The Specific Claim Construction Disputes.

#### 1. The Claims Indisputably Require Personal Communication Devices and a Distant Communication System Because They Appear in the Claim Bodies.

Plaintiff contends that the claims of the '858 patent do not require personal communication devices or a distant communication system. In making this argument, Plaintiff focuses solely on whether the preambles of independent claims 1, 7 and 13 are claim limitations. As explained below, the preambles are limitations. But regardless of whether the preambles limit the claims, the body of the claims themselves recite, and therefore require, personal communication devices and a distant communication system. For example, the body of claim 1

---

[5] The only constructions from Plaintiff's list of sixteen allegedly uncontested terms that Defendants do not dispute are the constructions for "variety of different," "RIF" and "plurality."

refers twice to both "said personal computer communication devices" and "said distant communication system." '858 patent, 5:57, 5:60, 5:67-6:2. The body of claim 7 recites "wireless personal RF communication devices" twice and "personal communication devices" once. *Id.* at 6:44-45, 6:47-48; 6:52-53. And the body of claim 13 recites "personal communication devices" and "wireless personal RF communication devices." *Id.* at 8:2-3; 8:7-8.

The fact that these terms are introduced in the preambles does not change the fact that they are also express limitations in the bodies of the claims. If a term appears in the body of a claim, it is a claim limitation. *See, e.g., Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 811 (Fed. Cir. 2002) ("By virtue of its inclusion in the body of [the claim], this phrase limits [the claim]."); *Koito Mfg. Co. v. Turn-Key-Tech, L.L.C.*, 234 F. Supp. 2d 1139, 1147 (S.D. Cal. 2002) ("[E]ven if the preamble language does not limit the '268 claim scope, this particular term does limit the claims by virtue of its inclusion in the claim body, and therefore the court will construe this term."); *British Telecomms. PLC v. Prodigy Communications Corp.*, 217 F. Supp. 2d 399, 413-14 (S.D.N.Y. 2002) (explaining that because the term "central computer" appeared in both the preamble and the body of the claims at issue, Plaintiff's argument that the phrase did not limit the claims was "without merit").

Not only are the personal communication devices and distant communication system limitations in the bodies of the independent claims, but dependant claims further limit these components of the claimed invention. For example, claim 5 adds the limitation that the "distant communication system comprises a satellite." '858 patent, 6:21-22. Claim 11 requires that "at least one of said variety of different radiatively communicative wireless RF communication devices . . . comprises a laptop computer." *Id.* at 7:5-8. And claim 17 similarly requires that "at least one of said . . . wireless personal RF communication devices is a personal laptop computer." *Id.* at 8:25-27. Dependent claims "contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed." *See* 35 U.S.C. § 112, ¶ 4. It would make no sense to have dependent claims directed to specific types of distant communication systems or specific types of personal communication devices if the distant

6

communication system and the personal devices were not limitations of the independent claims in which they appear. Plaintiff's position, which would render these dependent claims utterly meaningless, should be rejected.[6]

### 2. The Preambles Are Claim Limitations and Require That the Personal Communication Devices Are Allowed To Transmit RF Signals To and Receive RF Signals From a Distant Communication System.

Plaintiff contends that the preambles of claims 1, 7 and 13 are not limitations because the preambles were not relied on during prosecution to distinguish from prior art and because the deletion of the preambles allegedly "does not affect the structure or steps of the claimed invention." (Pl. Br. at 7 (quoting *Catalina*, 289 F.3d at 809).) But reliance on the preamble during prosecution is just one of many ways that a preamble can be found to limit a claim. *Catalina*, 289 F.3d at 808-09. And Plaintiff ignores the fact that if the preambles were deleted, the phrases in the bodies of the claims requiring personal communication devices and the distant communication system would no longer have antecedent basis. Plaintiff's own expert confirms that the preambles provide antecedent support. (Brown Decl. ¶¶ 10, 14.) In other words, the preambles here **cannot** be deleted and still have the claims recite a structurally complete invention. As Plaintiff's own primary case explains, "dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." *Catalina*, 289 F.3d at 808; *see also e.g.,* Dkt. No. 41, Def. Br. at 3 (citing additional cases for the same point); *In re Papst Licensing GMBH & Co.*, 2009 U.S. Dist. LEXIS 49870, at *35 (D.D.C. June 12, 2009) ("[W]here a preamble provides an antecedent basis for terms found in the body of the claims, it acts as a necessary component of the claimed invention and serves as a claim limitation.")

---

[6] Plaintiff's reliance on Dr. Brown's statement that a system for enabling communication between a personal device and a network "does not **usually** encompass the device and/or the network" is likewise unavailing. (Brown Decl. ¶ 19 (emphasis added); *see also* Pl. Br. at 8.) Dr. Brown did not say that a system for enabling communication would always exclude the personal device and the distant communication system. And here, the language of the claims themselves require the personal devices and distant communication system to be limitations. Dr. Brown's testimony cannot be used to contradict the claims. *Phillips*, 415 F.3d at 1318.

(internal citation omitted).

In addition to providing antecedent basis, the preambles at issue here recite "additional structure or steps underscored as important by the specification," which causes the preambles to "operate as a claim limitation." *Catalina*, 289 F.3d at 808. Specifically, the specification of the '858 patent emphasizes that:

> **It is an object of the present invention** to permit a user of a portable hand-held electronic communication device…to conveniently use that same hand-held device/cellular phone in an automobile, plane or building, office/desk, or anywhere signal transmission is needed, and to permit **such signal** to reach **its intended destination such as a communications network or satellite**, without interfering with other electrical equipment and in spite of interfering walls of buildings or structure and/or other electrical equipment.

'858 patent, 1:37-46 (emphasis added). In other words, as reflected in the preambles, an important object of the invention is to allow an RF signal from a personal device to reach a distant communication system. The Court should thus conclude that the preambles of claims 1, 7 and 13 limit the claims and make clear that the claimed system and methods require the personal communication devices to transmit RF signals to, or receive RF signals from, a distant communication system, as specified in the preambles.

*Intirtool* and *Fujifilm*,[7] upon which Plaintiff heavily relies, are not to the contrary. With respect to *Intirtool*, Plaintiff contends, without citation, that the court found that the terms "sheet metal" and "punching and connecting," which appeared in the preamble, were not claim limitations. But the *Intirtool* court said nothing about whether "sheet metal," which also appeared in the body of the claim, was a limitation – the dispute centered on whether the "punching and connecting" language found only in the preamble was a limitation. *Intirtool, Ltd. v. Texas Corp.*, 369 F.3d 1289, 1292-96 (Fed. Cir. 2004). In fact, the court noted that one of the "specific structural limitations set forth in the body of [the claim at issue]" was "bending the sheet metal plug formed by said cut substantially at an imaginary cord on the uncut sheet metal."

---

[7] The case that Plaintiff refers to as "*Fujifilm*" is actually *In re Papst Licensing*.

*Id.* at 1295.

With respect to *Fujifilm/Papst*, Plaintiff asserts, again without citation, that the court found that the "data transmit/receive device," which appeared in the preamble and body of the claims, was not a claim limitation. (Pl. Br. at 8.)  But the court found no such thing.  The court actually held that "the preamble is limiting because it describes structures that comprise the invention and the relationships among those structures:  'An interface device for communication between a host device . . . and a data transmit receive device.'" *In re Papst*, 2009 U.S. Dist. LEXIS 49870, at \*35.  In the portion of the case discussing the "data transmit/receive device," the court concluded that "it should not define the nature of a data transmit/receive device" but never held that the data transmit/receive device was not a limitation; that was one of the party's positions, but it was not adopted by the court.  *Id.* at \*51-57.  As Plaintiff points out, the preamble at issue in *Fujifilm/Papst* is similar to the ones in the '858 patent, and it was found to be a claim limitation.  The same result should obtain here.

### 3.  Plaintiff's Constructions For The Terms Requiring Personal Communication Devices Inject Ambiguity and Are Not Supported By The '858 Patent.

#### a.  "Personal" devices do not have to be owned by their user.

Plaintiff appears to contend, through the injection of the word "private," that whether a communication device qualifies as a "personal" one turns on whether the device is owned by its user.  (Pl. Br. at 9.)  However, a device can be "personal" without being owned by its user.  For example, people frequently use laptop computers provided by their employers or borrow someone else's cellular telephone.  Those computers and phones indisputably qualify as "personal" devices even though the individual using the device does not own it.

To support its position, Plaintiff quotes an isolated statement from the "Background of the Invention" stating that a hand-held device "should [be] able to travel with its owner." (Pl. Br. at 9 (citing '858 patent, 1:28-30).)  The word "should" is permissive, not mandatory, and this sentence hardly means that a device must be "owned" by the user to qualify as a personal communication device.

Even Plaintiff's expert does not equate "personal" with "private" or with ownership. Instead, he merely says that a personal communication device is designed to be used by an individual and must be "portable and personal." *See, e.g.*, Brown Decl. ¶¶ 8, 11, 12, 15. Dr. Brown does not explain what he means by the word "personal," and the term alone does not provide sufficient guidance about the meaning of the claim phrases. For example, does "personal" mean that the device is owned by the user, as Plaintiff appears to contend? (Pl. Br. at 9.) Does "personal" mean that the device is merely intended for private use or use by one person at a time as Plaintiff's dictionary suggests? (Pl. Br. at 10.) The term "personal" alone is hopelessly ambiguous. As reflected in Defendants' proposed constructions, the specification makes clear that when the '858 patent uses the term "personal" it means that the devices can be carried by individuals. *See, e.g.*, '858 patent, Abstract; 1:7-8; 1:23-25; 1:27-40; 2:48-58; 3:9-11; 3:13-23; 3:37-38; 3:44-46; 4:5-7; 4:14-17; 5:18-19; 5:26-27; 5:41-43. The Court should clarify this for the jury.

### b. "Personal computer communication devices" are not limited to personal computers.

With respect to the term "personal computer communication devices" in claim 1, Plaintiff's construction should be rejected because it is ambiguous. Although Plaintiff's construction states that the term should mean "a personal computer having a communication interface," Plaintiff does not actually contend that the claimed devices are limited to personal computers as that term is commonly understood (i.e., laptop or desk top computers). For example, neither Plaintiff nor Dr. Brown states that a cellular telephone would fall outside the scope of Plaintiff's proposed construction. (Pl. Br. at 10; Brown Decl. ¶ 9.) However, in common usage of the term, a cellular telephone, a personal digital assistant (PDA), a Blackberry, a smart phone and other similar devices would not be called a "personal computer." Presumably to cover these types of devices, Plaintiff goes on to specify that a personal computer, as it uses the term, should be construed to mean "a private, individual electronic data processing device which is generally programmable to execute personally controllable application software." But

this is incorrect (Michalson Decl. ¶¶ 7-8) and overly complicated and confusing for the jury. Defendants' construction makes clear that the term "personal computer communication devices" are not limited to traditional personal computers (a point on which the parties appear to agree); they are devices that can be carried by an individual and include or are used with a computer.

### 4. The "Radiative RF Antenna" On The Personal Devices Is External.

As explained in Defendants' opening brief, in order to distinguish prior art during the prosecution history of the related '471 patent, the patentee made clear that the radiative RF antenna on the personal communication devices must be "external." (Def. Br. at 7-8.) As also explained therein, Plaintiff cannot recapture specific meanings disclaimed during prosecution. (Def. Br. at 7-8 (citing cases).) Despite paying lip service to the prosecution history, Plaintiff ignores it completely.

The fact that the personal device has an external antenna is also consistent with the purpose of the invention because it allows the external antenna on the device to be placed within an RF shielded area and the device to still be accessed/utilized outside the shield. *See* U.S. Patent No. 5,711,014 (which is incorporated into the '858 patent ('858 patent, 1:7-16)), Fig. 2 (showing external antenna inside "antenna receiving compartment 18") (Koh Opening Decl. Ex. 7). This is also consistent with the figures of the '858 patent. Figures 1A and 1B show an external antenna on the personal communication device, while the other figures do not indicate the location of the antenna. (Michalson Decl. ¶ 28.)

### 5. The "First RF Antenna" Is a Probe Juxtaposed With The Radiative RF Antenna Of a Personal Communication Device.

Plaintiff's assertion (Pl. Br. at 12; Brown Decl. ¶ 40) that an "RF antenna" is the same as a "radiative RF antenna" is incorrect. (Michalson Decl. ¶¶ 21-26.) The independent claims of the '858 patent refer to a "radiative RF antenna"/"RF radiative antenna" on the personal communication devices and a "second RF antenna" that "radiate[s]" outside the specified environment. *See* '858 patent, 5:52-66; 6:28-56; 7:17-8:10. But the claims never refer to the "first RF antenna" as being radiative. This word choice is not inconsequential. The antennas on

11

the personal devices and the second RF antenna are referred to as "radiative" because they are capable of sending and receiving signals in the far field. (Michalson Decl. ¶¶ 24-25.) In contrast, the "first RF antenna" is a juxtaposed probe that is operating in the near-field; it is not a far field antenna. (Michalson Decl. ¶¶ 21-23, 25-26.)

Consistent with the fact that the probe, which Plaintiff acknowledges is the only structure described in the specification that could serve as a first RF antenna (Pl. Br. at 13; Brown Decl. ¶ 39), is operating in the near field, the specification consistently describes the probe as being "juxtaposed" to the antenna located on the personal communication device, and the prosecution history describes the probe as being in "close proximity" to the antenna on the personal communication device. (Def. Br. at 9-11.)

Although Plaintiff asserts that the "focal area" that contains the probe can be an entire building or vehicle such that the communication device and probe "may be tens or hundreds of feet apart, or more" (Brown Decl. ¶ 42 (relying on Figure 3B of the '858 patent)), the '858 patent says nothing of the like. The "focal area" is described in the patent as being an area defined by the "shield" in the "docking system," not as an entire building or vehicle. *See, e.g.,* '858 patent at 2:4-18; 2:38-40; 2:62-66; 3:55-60; 4:23-36; 4:65-67; 5:18-24. And Figure 3B of the '858 patent in no way refutes that the personal communication device is juxtaposed to the probe. Figure 3B does not show the personal communication device, and thus does not indicate how close or how far the personal communication device is from the probe. And, the rest of the specification makes clear that the personal device must be juxtaposed/in close proximity to a probe. (Def. Br. at 9-11.)

### 6. The "Communications Link" Is a Hard-Wired Transmission Line.

Plaintiff's contention that the communications link can include the control unit/control computer is without merit. The claims make clear that the control computer controls the "communications link." *See, e.g.,* '858 patent, 5:62-66. It would make little sense for the control computer to control itself. The communications link is the "transmission line" repeatedly described in the patent as connecting the probe (i.e., the first RF antenna) and the remote antenna

(i.e., the second RF antenna). *See, e.g., id.* at 1:62-2:3; 2:41-43; 2:47-3:3; 3:13-26; 4:67-5:6; 5:27-31; Figs. 1B, 2A, 2B, 3A, 3B, 4.

Plaintiff's contention that the communications link can be wireless is equally baseless. As Plaintiff points out, the specification states that the "transmission line" can be a coaxial cable, a waveguide, an optical fiber or the like. (Pl. Br. at 15.) But these are all hard-wired connections. (Michalson Decl. ¶¶ 17-19.) There is nothing in the '858 patent to suggest that the transmission line can be wireless. In fact, a wireless communications link would defeat the primary purpose of the invention, namely, "minimizing the detrimental effects of radiation from common portable communication devices" ('858 patent, 5:41-43), because it would not confine the RF radiation between the first and second RF antennas. (Michalson Decl. ¶ 18.)

Likewise, Plaintiff's contention that the "RF signals that the first and second antennae provide may be converted to a different format for transmission over at least a part of the communications link between the first and second antennae" (Pl. Br. at 15-16) finds no support in the specification. Plaintiff's own expert declaration does not even endorse this view, and it is rebutted by Defendants' expert, Dr. Michalson. (Michalson Decl. ¶ 20.)

### 7. The Terms "Control Computer," "Control a Communications Link" and "Controlling Said RF Signals" Are Indefinite.

Plaintiff contends that the "control computer" is "a data processing device that exercises restraint or directly influences some other device." (Pl. Br. at 16.) In support of this construction, Plaintiff relies on Dr. Brown's unsupported declaration. However, in opposing Defendants' currently pending Motion for Summary Judgment of Invalidity for Failure To Comply With 35 U.S.C. § 112, Plaintiff advances a different construction of "control computer." In its opposition, Plaintiff relies on a second expert, Dr. David Starobinski, who asserts, again without any support, that a "control computer" is "a programmable device capable of (1) measuring usage of a communication link; (2) processing information related to usage of the link; or (3) sending commands to physical elements, such as a switch or a filter, attached to the link." (Dkt. No. 52, Starobinski Decl. at ¶ 6.) The fact that Plaintiff's experts cannot agree on

13

what the term "control computer" means underscores the fact that the term, in the context of this patent, is indefinite. *See* Dkt. No. 37 at 6-9; 15-17 (Defendants' motion for summary judgment of invalidity). As set forth in Defendants' opening brief, at best, the control computer is a programmable device without limitation as to how it is programmed.

Plaintiff proposes a construction for "arranged to control a communications link" and its expert asserts that "controlling said RF signals" means the same thing as "control a communications link." (Pl. Br. at 17-18; Brown Decl. ¶ 31.) However, as explained in Defendants' opening brief, the terms "control a communications link" and "controlling said RF signals" are indefinite and impossible to properly construe. (Def. Br. at 14-15.) Plaintiff and its expert have confirmed that the meaning of "control" or "controlling" involves an undetermined structure from a non-exhaustive list performing one or more of a non-exhaustive list of pure functions. (Pl. Br. at 18 (relying on Brown Decl. ¶ 30); Brown Decl ¶ 30 (listing various functions the control computer "may" perform and stating that they are "example functions of controlling a communication link").) It is even unclear from Plaintiff's constructions whether "controlling RF signals" requires controlling the signals, as opposed to something else. This corroborates that these terms fail to meet the definiteness requirement and are impossible to meaningfully construe. (Def. Br. at 14-15.)

## 8.  Whatever the "Control Computer" Is, It Is Located Within The Vehicle or Other Local Environment.

Plaintiff's construction of "control computer" should also be rejected because it would permit the control computer to be located outside the vehicle or local environment. As explained in Defendants' opening brief, the control computer is always described in the specification as being attached to the transmission line between the probe (i.e., the first antenna) and the remote antenna (i.e., the second antenna). The control computer is consistently described as being "in" or "connected into" the transmission line. (Def. Br. at 13-14 (citing numerous passages from the '858 patent).) And the '858 patent never indicates that any part of the system other than the remote antenna is located outside the vehicle or local environment.

14

Dr. Brown contends that Figures 3A and 3B show embodiments in which the control computer is "not placed within a local RF restricted environment." (Brown Decl. ¶ 24.) However, there is no indication in the patent that Figures 3A and 3B were drawn to show precise locations of the components of the system. The figures are clearly not drawn to scale (the computer 68 is significantly larger than the building 67) and cannot be taken as accurate representations of the locations of the various components, especially in light of all of the statements in the specification that make clear the control computer is located in the vehicle or local environment. *See, e.g., Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) (explaining that "figures in a patent are not drawn to scale unless otherwise indicated"). Moreover, Figure 3A just shows a focal area 16 with a shield 24 connected to the various other components. '858 patent, 4:22 -23 (focal area "16"); 4:29 (shield "24"). Figure 3A does not indicate the boundary of the local environment, and therefore does not suggest that the control computer could be located outside the local environment. Figure 3B similarly does not indicate that it is showing the control computer located outside the building. The lines connecting the control unit and control computer to the building 67 could just as likely be conveying that these components are located inside the building.

### 9.   "To Communicate" Should Not Be Construed In Isolation.

Plaintiff attempts to construe the term "to communicate" in isolation in order to morph its claims from involving the communication of "RF signals" to involving only the successful transmission of "information." Plaintiff's "ordinary meaning" of "communicate" from a dictionary (Pl. Br. at 14) cannot be used to contradict the fact that the claims themselves specify that an RF signal, not "information," is what is being communicated. For example, claim 1 states: "to communicate an RF signal." '858 patent, 5:56. Claim 3 states: "to wirelessly communicate by RF communication." *Id.* at 6:12-13. Claim 7 requires "wirelessly communicating RF signals" and states that the personal communication devices "may be utilized to communicate wirelessly by an RF signal." *Id.* at 6:43; 6:52-54. And claim 13 requires

15

"communicating wireless RF signals." *Id.* at 8:1.[8] Plaintiff's attempt to rewrite its patent to ignore that RF signals are what is being communicated should be rejected.

Further, Plaintiff's contention that in order to "communicate" the signals must be both transmitted and received is without merit. Communication can be one way. Dr. Brown states that communication is "often bi-directional," not that is always is, and he acknowledges that "[c]ommunication can be unidirectional." (Brown Decl. ¶¶ 16, 20.) Thus, transmitting or receiving is communicating. (Michalson Decl. ¶ 13.)

In addition, Plaintiff's assertion that the communication must be "successful" should be rejected. The word "successful" does not appear in the '858 patent, and asserting that the claims require "successful" communication implies some mechanism for ensuring or measuring success. However, there is no such mechanism or requirement described in the specification or claims of the patent. Further, there are numerous applications in which errors in the transmission and/or reception of information are tolerable to a user. (Michalson Decl. ¶¶ 10-11.)

### 10. "Use" and "Time" Do Not Mean The Same Thing.

Plaintiff cites *Phillips* for the proposition that "claim terms must be interpreted in a way that gives meaning to each word." (Pl. Br. at 4.) But Plaintiff ignores its own canon of construction by asserting that "use" and "time" in the claims mean the same thing and that "bill for the time" and "bill for use" mean the same thing. (Pl. Br. at 18-19.) The Court should give meaning to each word in the claims and reject Plaintiff's attempt to read the "time" requirement out of its claims.

To support its contention that time means the same thing as use, Plaintiff points to unsupported statements in its expert's declaration and a dictionary definition of "time" from The American Heritage Dictionary of the English Language that has been cherry-picked over other definitions from that dictionary. (Pl. Br. at 18-19.) Tellingly, the dictionary that Plaintiff cites in numerous other places in its brief provides as its primary definition of "time:" "the measured or

---

[8] Plaintiff states that "to communicate" also appears in claim 2 (Pl. Br. at 14), but it does not.

measurable period during which an action, process, or condition exists or continues." Koh Reply Decl. Ex. 5 (Merriam-Webster Online Dictionary). This is in keeping with Defendants' proposed constructions, which give the word "time" a meaning distinct from "use" and properly focus on the fact that time means a specified time interval, such as seconds, minutes or hours.

### 11. Claims 7 and 13 Require RF Signals To Be Traveling Between Personal Communication Devices and the Second RF Antenna.

As explained in Defendants' opening brief, the claims contain various terms directed to controlling RF signals sent "between" personal communication devices within the local environment and the second RF antenna radiating outside the environment or the distant communication system. (Def. Br. at 15-16.) For example, claim 7 requires "controlling said RF signals sent between said variety of different radiatively communicative wireless personal RF communication devices within said local environment and said second RF antenna radiating outside of said local environment." '858 patent, 6:46-50. Claim 13 similarly requires "controlling said RIF signals and limiting the time said RF signals are sent between said variety of different radiatively communicative wireless personal RF communication devices within said RF restricted environment and said second RF antenna radiating outside of said RF restricted environment." *Id.* at 8:5-10. Defendants' constructions for these claim phrases should be adopted because they make clear that, based on the plain language of the claims themselves, RF signals must be traveling from the personal communication devices to the second RF antenna.

### 12. Plaintiff's Construction of "RF Signal" Is Incorrect.

To the extent Plaintiff's construction of "RF signal" requires that the signal be a radiated electromagnetic field, instead of an electrical signal traveling on a wire" (Pl. Br. at 22), it should be rejected. Although the claims make clear that the RF signal must be capable of wireless transmission, this does not mean that RF signals cannot travel on hard-wired connections. In fact, they commonly do. (Michalson Decl. ¶¶ 17-18.) Far from disputing this, Plaintiff acknowledges that "a simple cable" can "directly convey[] RF signals." (Pl. Br. at 15.)

As explained above, the specification and claims specify that RF signals travel wirelessly

from the personal communication devices to the first antenna, then on a hard-wired connection from the first antenna to the second RF antenna, and then wirelessly from the second antenna to the distant communication system. *See supra* Sections II.D.2; II.D.6; II.D.11. Plaintiff's proposed construction of "RF signal" is at odds with this and should be rejected.

Plaintiff's construction of RF signal should also be rejected because it specifies an erroneous range for the radiofrequency/RF spectrum. Plaintiff states that an RF signal is one "between the audio-frequency portion and the infrared portion of the electromagnetic spectrum," and goes on to assert that this means the portion of the spectrum "between approximately 300 kHz and 100 GHz." (Pl. Br. at 21-22 (citing Brown Decl. ¶¶ 12, 38).) But the portion of the electromagnetic spectrum identified by the U.S. Federal Communications Commission ("FCC") for the purposes of wireless communications is 9 kHz to about 300 GHz, and this range overlaps the audio spectrum which is from approximately 15 Hz to 20 kHz. (Michalson Decl. ¶ 14.)

For all of these reasons, the Court should reject Plaintiff's construction of RF signals and not construe the term. One of skill in the art would understand the frequencies and signal transmission methods used for RF versus other signals. (Michalson Decl. ¶ 14.)

### 13. Every Automobile, Building, Elevator, Airplane and Desk Is Not An "RF Restricted Environment."

Plaintiff apparently contends that every automobile, building, elevator, airplane and desk qualifies as an RF restricted environment. In Plaintiff's view, the environment merely has to be one "to or from which entering or escaping RF energy is attenuated," and, of course, every automobile, building, elevator, airplane and desk would attenuate RF energy to some degree (Michalson Decl. ¶ 29). To support its construction, Plaintiff relies on a portion of the specification describing the material that can be used to form the "shield" described in the '858 patent. '858 patent, 2:58-62. But neither this portion of the specification, nor any other part of the patent, states that an "RF restricted environment" only has to attenuate RF energy. Dr. Brown also equates the claimed RF restricted environment with the "focal area" described in the specification. (Brown Decl. ¶ 47.) However, the "focal area" is described as being an area

18

defined by the "shield" in the "docking system." The "focal area" is not equated with an RF restricted environment and is not an entire building or vehicle that merely attenuates RF energy:

> The shield defines a focal area for receipt and transmission of a radio frequency signal, when a communication device is placed within the focal area. The focal area or zone may be selected from the group of structures consisting of a desk, a room in a building, or a tray or the like in a vehicle.

'858 patent, 2:62-66. *See also, e.g., id.* 2:4-18; 2:38-40; 3:55-60; 4:23-36; 4:65-67; 5:18-24.

Dr. Brown states that an RF restricted environment is one in which RF "communication signals are at least partially restricted." (Brown Decl. ¶ 46.) But "restricted" means more than merely attenuated; it means that the signals are confined. *See* Koh Reply Decl. Ex. 6 (American Heritage College Dictionary at 1186 (4th ed. 2002) ("restrict" means "[t]o keep or confine within limits")). Defendants' proposed construction, which makes clear that the RF restricted environment provides a barrier that interferes with (i.e., confines) RF signals, is thus in keeping with Plaintiff's expert's own conclusions.

### 14. The "Shield" Does More Than Attenuate RF Signals; It Restricts Them.

To support its assertion that the RF signal shield in claims 6, 10, 12 and 14 merely attenuates electromagnetic fields, Plaintiff again points to the portion of the specification indicating that the shield can be made of "attenuative material." (Pl. Br. at 22-23 (citing '858 patent, 2:58-61).) But the fact that the shield can be made from attenuative material does not mean that the shield only has to attenuate an RF signal. The other portion of the specification Plaintiff cites (Pl. Br. at 23) states that the shield is used "to **prevent** the radiation (electromagnetic/microwave) emanating from [a] communication device 12 from traveling in any undesired directions within the desk, room, vehicle or building." '858 patent, 4:29-32 (emphasis added). Preventing radiation from traveling in undesired directions requires more than merely attenuating the RF signal. Moreover, the claims themselves state that the RF signal shield is arranged "to **restrict** undesired travel of a wireless RF signal transmission within [the] passenger vehicle." *Id.* at 6:24-26 (emphasis added); *see also id.* at 7:1-4 (shield "restrict[s]"); 8:11-16 (shield "control[s] undesired travel"). As explained above, "restrict" means more than

just attenuate – it means to confine within limits.  Thus, the claims themselves make clear that the shield must do more than attenuate an RF signal.

In addition, as explained in Defendants' opening brief, the RF signal shield must be located **within** the passenger vehicle or local environment.  It cannot be the outer walls of the environment itself because the claims themselves require that the shield restricts travel of RF radiation "**within**" the passenger vehicle or local environment.  (Def. Br. at 18-20.)  Plaintiff asserts that the shield can be a room, vehicle, airplane or entire building.  (Pl. Br. at 23; Brown Decl. ¶ 45 (citing '858 patent, 4:28-33).)  But the portion of the specification cited actually says that the shield can be "placed on/in" a desk, room, vehicle or building – not that the shield can be the desk, room, vehicle or building itself.  '858 patent, 4:28-33; *see also id.* at 2:11-14 ("shield placed on/in the desk, room, vehicle or building to prevent the radiation from that communication device from traveling in any undesired directions within the desk, room, vehicle or building").[9]  Regardless, Plaintiff cannot be permitted to read out of the claims the limitation calling for the shield to be within the vehicle or local environment.

### 15. "Filter" and "Switch" Are Not the Same Thing.

By contending that "filter or switch communication" and "filtering said RF signals" mean the same thing, Plaintiff renders the term "switching" surplusage and again ignores the claim construction canon, referenced in its own brief, that "claim terms must be interpreted in a way that gives meaning to each word." (Pl. Br. at 4.)  Defendants' constructions, which give meaning to both "filter" and "switch," should be adopted.[10]

---

[9] The specification does state that an entire room within a building could be shielded ('858 patent, 5:16) but it never suggests that an entire desk, vehicle or building constitutes a "shield" or that a room that has not had shielding arranged therein would be shielded.

[10] Defendants refer to and incorporate the discussion in their opening brief concerning the phrases requiring "monitoring" (claim 4) and "regulating use" (claim 9).

Dated:  August 14, 2009

OF COUNSEL:
David T. Pritikin
Email:  dpritikin@sidley.com
Thomas D. Rein
Email: trein@sidley.com
Stephanie P. Koh
Email: skoh@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL  60603
Tel: 312-853-7000
Fax: 312-853-7036

Tung T. Nguyen
Email: tnguyen@sidley.com
**SIDLEY AUSTIN LLP**
717 N. Harwood, Suite 3400
Dallas, Texas 75201
Tel: 214-981-3300
Fax: 214-981-3400

/s/ Marc C. Laredo
Marc C. Laredo, BBO#543973
Email: laredo@laredosmith.com
Mark D. Smith, BBO#542676
Email: smith@laredosmith.com
**LAREDO & SMITH, LLP**
15 Broad Street, Suite 600
Boston, MA  02109
Tel: 617-367-7984
Fax: 617-367-6475

**ATTORNEYS FOR DEFENDANTS DELTA AIR LINES, INC. AND AIRCELL LLC**

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

August 14, 2009

/s/ Marc C. Laredo
Marc C. Laredo, BBO#543973