IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMBIT CORPORATION,

Plaintiff,

v.

DELTA AIR LINES, INC., AND
AIRCELL LLC,

Defendants.

Civil Action No. 1:09-CV-10217-WGY

Jury Trial Demanded

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO PRECLUDE TESTIMONY FROM CHRISTOPHER C. BARRY**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. Legal standards ..... 2

II. The Court Should Preclude Mr. Barry's Proposed Damages Testimony Because It Is Irrelevant And Unreliable. ..... 5

A. Mr. Barry Fails To Disclose Any Facts Linking His List Of Licenses To The Hypothetical Negotiation, Rendering His Proposed Testimony Irrelevant And Unreliable. ..... 5

1. Mr. Barry's Opinion Relies On Abstracts From Royalty Source, With No Actual Knowledge Or Analysis. ..... 5

2. Confronted With His Selected Licenses' Actual Content, Mr. Barry Admits To Fatal Flaws Under Federal Circuit Precedent. ..... 8

B. As Essentially Admitted By Mr. Barry, The So-Called "25% Rule" Is Irrelevant and Unreliable Under The Facts Of This Case ..... 13

C. Mr. Barry Disclosed An Untimely Supplemental Report Demonstrating Additional Indicia of Unreliability ..... 17

CONCLUSION ..... 19

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ....... 2, 5, 19

*Koito Mfg. Co., Ltd. V. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004) ....... 2

*Lucent Technologies, Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ....... 3, 4, 6, 13

*NewRiver, Inc. v. Newkirk Prods., Inc.*,
674 F. Supp. 2d 320 (D. Mass. 2009) ....... 2, 3

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ....... 3, 4, 5

**STATUTES**

Federual Rule of Evidence 702 ....... 1, 2, 5, 8, 19

**OTHER AUTHORITIES**

American Institute of Certified Public Accountants, *Statement on Standards for Valuation Services 1: Valuation of a Business, Ownership Interest, Security, or Intangible Asset* (2007) ....... 13

Elizabeth A. Alquist & Cecilia Zhang Stiber, *Patent Damages Taking Center Stage at Fed. Cir.* (March 18, 2010) ....... 3

Linda S. Simard & William G. Young, *Daubert's Gatekeeper: the Role of the District Court Judge in Admitting Expert Testimony*, 68 Tul. L. Rev. 1457 (1994) ....... 1

## INTRODUCTION

The opinions of Plaintiff's damages expert Christopher C. Barry, while clothed in the robes of familiar theories, are applied in this case in a way that is unreliable and does not constitute relevant "knowledge." *See* Linda S. Simard & William G. Young, *Daubert's Gatekeeper: the Role of the District Court Judge in Admitting Expert Testimony*, 68 Tul. L. Rev. 1457, 1470-71 (1994) (cited by Dkt. 155 at 3-4). Accordingly, Mr. Barry's opinions are inadmissible under the Federal Rules of Evidence. *See id.*; Fed. R. Evid. 702.

Mr. Barry's report admittedly applies only two quantitative methodologies: (1) a purported "assessment of ten comparable licenses...found through a public source...known as RoyaltySource"; and (2) a so-called "25% Rule," or "rule of thumb." (Barry Dep., Ex. 1 at 72:6-18). Regarding the RoyaltySource licenses, Mr. Barry failed even to look at the licenses listed in his report or the publicly available information about them, instead relying exclusively on unverified abstracts. The information Mr. Barry cherry-picked from the abstracts amounts to little more than a list of company names and royalty percentages. He made no attempt whatsoever to carry his burden of demonstrating comparability, either from a technology or a business standpoint. Likewise, Mr. Barry's application of the so-called 25% Rule to this case is unreliable and lacks sufficient grounding to constitute applied "knowledge." According to Mr. Barry's own admissions, the 25% Rule has limited applicability, and yet he has made no attempt to determine whether it is properly applicable under the facts present here. Among other things, Mr. Barry made vital assumptions with no basis or explanation, failing to conduct any research or to consult a technical expert about facts that he admits are important if one is considering application of the 25% Rule.

Perhaps the lack of analysis and research in Mr. Barry's report is not surprising. He was retained the week prior to the report's due date, obtained information from RoyaltySource the week of the deadline, and received Aircell's documents from Plaintiff's counsel only two days before issuing his report. (Barry Dep., Hankinson Ex. 1 at 32:8-18, at 83:7-10, and at 84:16-

22).[1] But haste cannot be an excuse, particularly given Mr. Barry's failure to correct his analysis, and Plaintiff's ample notice of the Scheduling Order and the disclosure requirements of the Federal Rules of Civil Procedure. Mr. Barry's proposed testimony must be evaluated on the strength of his disclosed opinions and support, which are unreliable and should not be admitted at trial.

## ARGUMENT

### I. LEGAL STANDARDS

Under Federal Rule of Evidence 702, technical expert testimony is admissible only if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. This comports with the Supreme Court's requirements in *Daubert* that expert evidence must not only be based on a reliable principle or methodology, but also must "fit" the present case by having a "valid....connection to the pertinent inquiry as a precondition to admissibility." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590-92 (1993).

This Court has previously noted both in the instant action and in *Newriver v. Newkirk* that arguably more specific standards have been imposed by the Federal Circuit for the sufficiency of technical expert testimony in patent cases, exemplified by *Koito Mfg. Co., Ltd. V. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1149 (Fed. Cir. 2004). *See* Dkt. No. 155 at 2, 4-5; *NewRiver, Inc. v. Newkirk Prods., Inc.*, 674 F. Supp. 2d 320, 333-34 (D. Mass. 2009). The Court has characterized these standards as elements that proffered testimony "**must possess** in order to be 'relevant to the task at hand,'...or in Federal Circuit parlance, as constituting 'substantial evidence.'" Dkt. No. 155 at 5 (emphasis in original) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)). In its *NewRiver v. Newkirk* decision, the Court observed that "proactive judicial

[1] References to "Hankinson Ex." refer to exhibits to the Declaration of Thomas F. Hankinson in Support of Defendants' Motion To Preclude Testimony From Christopher C. Barry submitted concurrently herewith.

screening of…expert opinions in patent cases…will exclude junk opinions (the most necessary and salutary goal of the particularized restrictive Federal Circuit jurisprudence) and thereby enhance the centrality and importance of the jury's fact-finding function (rather than marginalizing the jury in the midst of a succession of arcane judicial opinions)." *NewRiver*, 674 F.2d at 336.

The same logic applies in the damages arena, particularly given the trend in the Federal Circuit toward strict standards for the sufficiency of expert testimony on the issue of damages. *See, e.g.*, Elizabeth A. Alquist & Cecilia Zhang Stiber, *Patent Damages Taking Center Stage at Fed. Cir.*, Law360 (March 18, 2010) (Hankinson Ex. 2) (stating that recent decisions "demonstrate the Federal Circuit's desire for the district courts to act as gatekeepers on patent damages awards, and send a strong message to patent owners: You need evidence to support your damages case."). The Federal Circuit has enunciated boundaries on the type of damages expert testimony that is sufficient to support a verdict. Exemplifying this trend are *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), and *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010).

In *Lucent Technologies*, the Federal Circuit held a damages expert's testimony insufficient to support a jury's verdict because, as presented, it "did not reach the 'substantial evidence' threshold and therefore no reasonable jury could have found that [the plaintiff] carried its burden of proving that the evidence" supported the awarded damages. *Lucent*, 580 F.3d at 1335. Of particular relevance here, the Federal Circuit specified that the plaintiff bore the "<u>burden to prove</u> that the licenses [relied on by plaintiff's expert] were <u>sufficiently comparable</u> to support the lump-sum damages award," and that such an award "cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers, one of which is arguably in the ballpark of the jury's award, particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here." *Id.* at 1329 (emphasis added). According to the Federal Circuit, the license agreements relied on "were created from

events far different from a license negotiation to avoid infringement of the one patent [in suit]," and thus were insufficiently linked to the hypothetical negotiation to be probative. *Id.* at 1327.[2]

In *ResQNet.com*, the Federal Circuit similarly vacated the district court's damages award because the district court relied on complex license agreements involving more than just naked patent rights "without any factual findings that accounted for the technological and economic differences between those licenses and the [patent at issue]." *ResQNet.com*, 594 F.3d at 873. Notably, the Federal Circuit again found no substantial evidence to support the award, despite plaintiff's *unrebutted* damages expert testimony, holding that "[t]he inescapable conclusion is that [the plaintiff's expert] used unrelated licenses on marketing and other services...to push the royalty up into double figures." *Id.* at 870. The court explained: "[A] reasonable royalty analysis requires a court to hypothesize, not to speculate. At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention." *Id.* at 869 (citation omitted).

In sum, the Federal Circuit continues in the damages arena what it began with technical experts: reversal of verdicts that rely on expert testimony that lacks a sufficient explanation of the basis for the opinion in the record. Similar to what this Court has pointed out in the technical

---

[2] Throughout the *Lucent* decision, the Federal Circuit repeatedly rejected evidence about allegedly comparable licenses because the plaintiff's expert failed to explain their relationship to the hypothetical license at issue. *See, e.g., id.* at 1328 ("[The plaintiff's] expert supplied no explanation to the jury about the subject matter or patents covered by those agreements"); at 1329 ("The [plaintiff's expert's] testimony provides no analysis of those license agreements, other than, for example, noting the agreement was a cross-license of a large patent portfolio and the amount paid."); at 1330 ("For a jury to use a running-royalty agreement as a basis to award lump-sum damages, however, some basis for comparison must exist in the evidence presented to the jury."); at 1330 ("[The plaintiff's] expert never explained to the jury whether the patented technology [in an alleged comparable license] is essential to the licensed product being sold, or whether the patented invention is only a small component or feature of the licensed product."); at 1331 ("But the jury again did not hear any explanation of the types of products covered by the agreement or the various royalty rates set forth in the agreement....[The plaintiff] did not explain how the fact that the...agreement involved eight patents affects how probative it is of the Microsoft-Lucent hypothetical negotiation over one patent"); and at 1331 ("[T]he jury had little to no testimony explaining how such complexity [in the allegedly comparable license] would have affected the hypothetical negotiation analysis.").

realm, to square these particularized damages standards with the Federal Rules of Evidence, they might be characterized as what it takes to be "relevant to the task at hand." Dkt. No. 155 at 5 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

Because Mr. Barry fails to provide any analysis linking his quantitative benchmarks to the technology and circumstances of the hypothetical negotiation in this case, his proposed testimony is inadmissible under the general standards of *Daubert* and Rule 702. Moreover, the unreliability and irrelevance of his opinions are even more clear when viewed through the lens of Federal Circuit law regarding the sufficiency of damages evidence to support a verdict.

## II. THE COURT SHOULD PRECLUDE MR. BARRY'S PROPOSED DAMAGES TESTIMONY BECAUSE IT IS IRRELEVANT AND UNRELIABLE.

Expert testimony must be "based upon sufficient facts or data," Fed. R. Evid. 702, and "a reasonable royalty analysis requires a court to hypothesize, not to speculate." *ResQNet.com*, 594 F.3d at 869. Accordingly, Mr. Barry must base his opinions soundly in facts and data in order for his testimony to be admissible at trial. As discussed in detail below, Mr. Barry's only two quantitative methodologies are both fatally flawed. Mr. Barry's disclosure of his RoyaltySource licensing analysis is wholly unreliable, because it amounts to nothing more than a list of companies and royalty amounts from RoyaltySource's abstracts with no investigation or opinion about the licensed technologies, the circumstances of the actual licenses, or the business terms accompanying the royalty numbers. Absent this rudimentary list of licenses, Mr. Barry's only other quantitative methodology is a naked application of the 25% Rule, a "rule of thumb" methodology that Mr. Barry essentially admits is not proper under the facts of this case, as addressed in more detail below.

### A. Mr. Barry Fails To Disclose Any Facts Linking His List Of Licenses To The Hypothetical Negotiation, Rendering His Proposed Testimony Irrelevant And Unreliable.

#### 1. Mr. Barry's Opinion Relies On Abstracts From Royalty Source, With No Actual Knowledge Or Analysis.

The entirety of Mr. Barry's disclosure regarding the purportedly comparable licenses is contained in Exhibit 6 of his report, which lists the licensor, licensee, industry, date, and royalty

numbers. (Barry Report, Hankinson Ex. 3 at "Exhibit 6"). His entire analysis of these agreements is contained in paragraph 36 of his report. (Barry Report, Hankinson Ex. 3 at 9). Without any disclosed basis or support, Mr. Barry notes in the passive voice that the ten listed licenses "were deemed adequate proxies for the '858 patent" and that their royalties ranged from 1% to 10%. (*Id.*). This proposed testimony is exactly the type that the Federal Circuit found insufficient to support a damages award in *Lucent*: "little more than a recitation of royalty numbers" in which "it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here." *Lucent*, 580 F.3d at 1329. This cannot be a reliable application of principles to the facts of this case, as Federal Rule of Evidence 702 requires, because Mr. Barry makes no disclosure of how the purportedly comparable licenses relate to the hypothetical negotiation at issue in this case.

Defendants subsequently learned why Mr. Barry disclosed no opinions or analysis comparing his so-called "adequate proxies" to the hypothetical negotiation at issue. In preparing his report, Mr. Barry relied exclusively on abstracts prepared by RoyaltySource with no knowledge of the agreements themselves and no investigation of publicly available information about them. (Barry Dep., Hankinson Ex. 1 at 79:16-80:1 and at 84:16-22)[3].

At his deposition, Mr. Barry admitted that he did not look at the licenses themselves or at publicly available SEC filings discussing them. At the same time, he: (1) acknowledged that one

---

[3] Here are the referenced exchanges:

> Q: As of the time that you prepared your report, that [RoyaltySource] abstract was the only information you had on the ten deals at issue, correct?
> A: I think that's right.
> * * *
> Q: When did you first start the process of obtaining information from RoyaltySource?
> A: That probably was the week before the report due date.
> Q: So time constraints are the reason why you didn't go beyond the abstracts here?
> A: Yes.

(*Id.* at 79:22-80:1 and at 84:16-22).

should not rely on licenses unless they are truly comparable (*Id.* at 73:10-22); and (2) answered "Yes" to the question, "So it's important before you apply the market approach as you did to analyze the licenses to see if they are in fact comparable, correct?" (*Id.* at 73:23-74:2).[4] Compounding this serious methodological problem, Mr. Barry did not know whether any of the technologies in the abstracts had available alternatives, did not know whether they were employed in the accused system in this case, did not know if they provide comparable advantages or benefits to the '858 patent, and did not recall consulting with a technical expert. (*Id.* at 89:17-91:22). Tellingly, Mr. Barry attempted at his deposition to defend his reliance on these licenses by employing admittedly circular reasoning:

> Q: What technology has more economic value, this [Celeritas/Toshiba licensed] technology or the '858 technology, do you know?
>
> A: I'd say the '858 probably.
>
> Q: You base that on what?
>
> A: That the '858 warrants an 8 to 10 percent rate, and this gets only a 3 percent rate.
>
> Q: That's kind of circular, isn't it?
>
> A: I thought you would ask me a question like that.
>
> * * *
>
> Q: This really doesn't tell you one way or the other whether it's more or less valuable than the '858 technology, does it?
>
> **A: I would concede I don't know enough about the details of the underlying technology here to conclude higher or lower than the '858.**

(*Id.* at 137:1-138:4).

---

[4] Moreover, Mr. Barry also failed to investigate any information about the financial condition of AMBIT at the time of the hypothetical negotiation, admitting at his deposition that he did not know AMBIT's financial condition in 2008 and had not seen any financial data regarding AMBIT. (*Id.* at 147:12-148:14).

Under Federal Rule of Evidence 702 and Federal Circuit law on patent damages, Plaintiff cannot rest its damages case on unsupported assertions by an accounting expert about technical matters -- rather, Plaintiff bears the burden to prove that Mr. Barry's opinions are sufficiently grounded in fact to bear its burden of proving non-speculative damages at trial. Mr. Barry's report contains no analysis whatsoever tying or comparing RoyaltySource's unverified abstracts to the hypothetical negotiation in this case. This is an independent and sufficient ground to preclude Mr. Barry from offering his opinions regarding the so-called "adequate proxies."

**2. Confronted With His Selected Licenses' Actual Content, Mr. Barry Admits To Fatal Flaws Under Federal Circuit Precedent.**

In addition, Mr. Barry did not make any attempt to compare the business terms and conditions of his so-called "adequate proxies" with the hypothetical license that would be negotiated in this case. In fact, Mr. Barry has not disclosed one iota of analysis to explain how the royalty rates in his so-called "adequate proxies" might be affected by the differences between their circumstances and the circumstances of Aircell and AMBIT at the time of the alleged infringement and the hypothetical negotiation. After receiving Mr. Barry's report, Defendants' expert pulled up publicly available information relating to Mr. Barry's "proxy" licenses, information which Mr. Barry admitted at his deposition revealed significant differences that were neither recognized nor explained in Mr. Barry's report.

To use an analogy, Mr. Barry's approach is like analyzing the value of a house by listing the prices of other properties without any information as to whether the property even contained a home, what other structures were present on the property, how many rooms the other buildings have, when they were built, or in what neighborhood they are located. Indeed, in looking at the information that is publicly available, it now appears that some of the items on Mr. Barry's list are not even "houses," let alone demonstrably comparable ones. The hypothetical license that would be negotiated in the instant case is a "naked license" to the '858 patent. By contrast, Mr. Barry's so-called "adequate proxies" differ (or lack important factual information) in at least the following ways, as admitted by Mr. Barry at his deposition:

**Table 1: Barry's Admissions Regarding the So-Called "Adequate Proxies"**

| No. | Abstract On Which Barry Relies | Differences From the Hypothetical Negotiation (or Lack of Basis for Opinion) Admitted at Barry's Deposition |
|---|---|---|
| 1 | ASI Entertainment / ASIQ (May 29, 2008)<br><br>(Hankinson Ex. 1 at 96:4-104:9 and at 108:9-116:11) | -Not known if licensed technology is patented. (98:16-21)<br><br>-License includes developmental assistance. (99:12-14)<br><br>-License includes marketing assistance. (99:15-17)<br><br>-License includes non-apportioned upfront payment. (100:12-101:11)<br><br>-Not known how important technology is to underlying product or service or if there are any alternatives. (102:2-5; 103:23-104:1)<br><br>-License disclosed to SEC as a related-party transaction, and there is indeed overlap between the directors; according to Mr. Barry, the effect of this on the license terms is "indeterminate," and generally, "a related-party transaction can be suspect as far as whether or not it's on arm's length terms." (61:18-24; 102:6-103:7)<br><br>-An additional ASI/ASIQ agreement -- that Mr. Barry does not recall from RoyaltySource abstract and does not include in his analysis-- sold the licensed technology for a $250,000 lump sum. (105:22-106:19 and 107:4-17)<br><br>-"We don't know the precise metes and bounds of the so-called intellectual property that's being conveyed here." (113:24-114:2)<br><br>-"I'd say, in balance, [the business terms] are somewhat differentiated from what would exist between AMBIT and Aircell." (115:7-12) |
| 2 | ASI Entertainment / ASIQ (June 18, 2008)<br><br>(Hankinson Ex. 1 at 104:10-116:11) | -License is exclusive, which makes it more valuable. (104:16-105:1)<br><br>-Not known if licensed technology includes patents, trademarks, know-how, or other aspects, or even if there is a U.S. patent application. (105:4-21; 113:9-12)<br><br>-An additional ASI/ASIQ agreement -- that Mr. Barry does not recall from RoyaltySource abstract and does not include in his analysis-- sold the licensed technology for a $250,000 lump sum. (105:22-106:19 and 107:4-17)<br><br>-Not known what the perceived market or royalty base is. |

| | | |
|---|---|---|
| | | (108:17-110:5)<br>-Not known what the profitability of convoyed sales may be. (110:6-18)<br>-Suffers from same related-party flaw as in license #1 above, and Mr. Barry did not make any attempt in his report to determine how this affected the terms of the transaction; generally, "a related-party transaction can be suspect as far as whether or not it's on arm's length terms." (61:18-24)<br>-"We don't know the precise metes and bounds of the so-called intellectual property that's being conveyed here." (113:24-114:2)<br>-"I'd say, in balance, [the business terms] are somewhat differentiated from what would exist between AMBIT and Aircell." (115:7-12) |
| 3 | Broadband / Bosch<br>(Hankinson Ex. 1 at 122:7-130:2) | -Agreement goes significantly beyond naked patent license. (123:7-20)<br>-Running 3.5% royalty is said to be for U.S. distribution rights. (125:10-23)<br>-Not known how important the licensed technology is compared to the '858 patent. (126:12-15)<br>-Agreement involves more than one U.S. patent, plus invention disclosures, know-how, and software. (128:3-24)<br>-Cannot say what the royalty would be for U.S. patent rights for just one patent as opposed to everything else. (129:13-130:2) |
| 4 | Celeritas / Toshiba<br>(Hankinson Ex. 1 at 130:3-132:22) | -Not known what the nature of the technology is or whether it is related to in-flight entertainment. (132:2-4)<br>-Not known if a patent is involved. (132:9-11)<br>-Royalty rate is 0.84%, which is below Mr. Barry's stated range. (132:19-22) |
| 5 | Ngee Ann / Intransil<br>(Hankinson Ex. 1 at 132:23-138:4) | -Not known if a patent is involved. (133:14-16 and 136:14-16)<br>-Involves an unknown "research contribution." (133:17-134:6)<br>-Not known if licensed product ever sold. (134:9-16)<br>-Not known what types of Internet access the licensed product relates to, or whether there is any connection to in-flight entertainment. (134:22-135:23)<br>-Not known if know-how was transferred. (136:17-21)<br>-Not known if the licensed technology was enabling of the |

| | | |
|---|---|---|
| | | product. (136:22-24)<br>-Cannot say how the value of the licensed technology compares to the '858 patent. (137:1-138:4) |
| 6 | Roaming Messenger / Zingerang<br>(Hankinson Ex. 1 at 138:5-144:11) | -Exclusive license with rights to sub-license. (139:10-15)<br>-Includes three patent applications. (139:16-24)<br>-Includes software, know-how, processes, methods, formulas, systems, designs, prototypes and materials. (140:1-19)<br>-Includes exclusive trademark license. (140:20-24)<br>-Includes optional lump sum payment in lieu of on-going royalties, which caps the reasonable estimate of the total value of the license at $600,000. (141:1-142:18)<br>-Perceived revenue base not known. (141:21-142:3)<br>-Mr. Barry's report discloses only the running royalty rate, not the cap, even though he admits that is inappropriate: "Q: Do you think you can just look at a running royalty rate in the abstract and ignore all other terms of the agreement? A: No. I think the full analysis requires looking at all the terms and conditions that you can have access to and that you have time to review." (143:23-144:11) |
| 7 | Screen Media / Redox<br>(Hankinson Ex. 1 at 158:6-159:8) | -Licensee's President owns licensor, so it is a related-party transaction. (158:6-19)<br>-"I'd have to think long and hard about [whether it would be excluded from the list if report was done over]. It maybe is excludable, but in any event, it certainly bears or should bear less weight." (159:1-5)[5] |
| 8 | Skydata / ACT<br>(Hankinson Ex. 1 at 159:9-163:19) | -Not known what licensed patent covers or whether it is employed in the accused product in this case. (159:20-160:10)<br>-Not known if it is related to in-flight entertainment. (161:14-16)<br>-Patent applies to satellite-based communications systems, not air-to-ground communications systems like accused product in this case. (161:17-23)<br>-Agreement is between competitors, which would generally |

[5] As discussed below, Mr. Barry submitted an untimely supplemental report in which he failed to mention this adjustment, or any other adjustment, to his disclosed list of royalty numbers from abstracts and unfounded reliance thereon.

| | | |
|---|---|---|
| | | drive the royalty rate upward. (163:6-19) |
| 9 | Patriot Scientific / ASI<br><br>(Hankinson Ex. 1 at 163:20-172:4) | -Technology licensed is even farther from the '858 patent than the other license abstracts considered, and likely not related to in-flight entertainment or employed by the accused product in this case. (165:11-166:1)<br><br>-License includes copyright, U.S. and foreign patent rights and patent applications, trade secrets, know-how, confidential or proprietary information, trademarks, marketing research and materials, business plans, records, and other items. (166:2-167:4)<br><br>-License includes a $250,000 up-front payment and a cap of running royalties at $250,000. (167:5-14 and 168:10-15)<br><br>-"Q: So when we look at these capped royalty agreements, we don't really know what to make out of the running royalty rate aspect of it, do we? It's not necessarily comparable to an uncapped royalty rate, true? A: That's true." (171:23-172:4) |
| 10 | Cybersensor / Nevtah<br><br>(Hankinson Ex. 1 at 172:5-16) | -15% cross-ownership between licensor and licensee that gives some concern over whether this is an arm's-length agreement. (172:5-16) |

As demonstrated in Table 1, Mr. Barry's list of non-comparable license agreements are just the sort of non-evidence that the Federal Circuit has found cannot support a damages theory at trial. Moreover, Mr. Barry agrees that one should not rely on a range of licenses if the data points in the range are not comparable. (Barry Dep., Hankinson Ex. 1 at 94:9-23). In discussing why he relied primarily on the 25% Rule, Mr. Barry admitted that the "licenses had both a wide range of rates and didn't strike me as being demonstratively as close to the subject technology as necessary." (*Id.* at 76:22-77:4).

Mr. Barry attempted to shift the burden of proof on comparability, answering that royalty data points are meaningless if they "could be shown to be not at all comparable." (*Id.* at 94:15-19). But as made abundantly clear by the Federal Circuit, it is the offering party who bears the burden of demonstrating that the data points of other licenses are comparable, and thus

meaningful to the analysis. *See, e.g.*, *Lucent*, 580 F.3d at 1329. This is a burden that Mr. Barry's sparse list of companies and royalties, gleaned from unverified abstracts, cannot carry.

### B. As Essentially Admitted By Mr. Barry, The So-Called "25% Rule" Is Irrelevant and Unreliable Under The Facts Of This Case.

Aside from his list of license abstracts, the only other quantitative methodology employed by Mr. Barry is a "profit-split" approach known as the "25% Rule," a "rule of thumb." (Barry Dep., Hankinson Ex. 1 at 48:3-12 and at 72:6-18). Mr. Barry describes his use of the 25% Rule as "primary" and his use of the RoyaltySource abstracts as "confirmatory or secondary." (*Id.* at 76:3-7). As discussed below, Mr. Barry's approach is methodologically unsound both generally and under the specific facts and circumstances of this case.

Regarding the general standards of valuing intellectual property, in June 2007, the American Institute of Certified Public Accountants ("AICPA") issued a Statement on Standards for Valuating Services that applies to the valuation of intangible assets like intellectual property. (*See* Hankinson Ex. 4 at Cover and at 7). The statement includes a paragraph addressing "Rules of Thumb": "Although technically not a valuation method, some valuation analysts use rules of thumb or industry benchmark indicators...in a valuation engagement. A rule of thumb is typically a reasonableness check against other methods used and should generally not be used as the only method to estimate the value of the subject interest." (*Id.* at 19 (emphasis added)). Yet, Mr. Barry has admitted that he used the 25% rule of thumb as his primary method of valuing a license to the '858 patent, rather than as a reasonableness check on other quantitative data. Indeed, Mr. Barry has in actuality used the 25% Rule as his only method of valuation, since his so-called "adequate proxies" are merely a list of companies and royalties from unverified abstracts. Accordingly, Mr. Barry's analysis, taken generally, is not a reliable principle or methodology in the field of intangible asset valuation.

Mr. Barry's analysis is even more fatally flawed in applying his rule of thumb to the particular facts of this case. Mr. Barry admitted at his deposition that it is important when employing the 25% Rule to consider the contributions of other patented technology or other non-

patented technology beyond the patent that is at issue. (Barry Dep., Hankinson Ex. 1 at 56:21-57:2). Mr. Barry acknowledges in his report that Aircell owns more than 30 patents related to airborne telecommunications and that the Aircell service at issue utilizes "ATG" or "air-to-ground" technology. (Barry Report, Hankinson Ex. 3 at 2). Yet, Mr. Barry applies the 25% rule with no inquiry into what patented or non-patented technologies contribute to the accused Gogo® service. For example, Mr. Barry fails to acknowledge or analyze the technologies and investments involved in communicating between the plane's ATG antenna and Aircell's ground stations. The '858 patent that is the subject of the hypothetical negotiation in this case is silent as to how communication from the plane's ATG antenna to the ground is effectuated, including but not limited to the appropriate software, hardware, and infrastructure that must be present in each ground station. It is beyond dispute that these air-to-ground communication technologies and investments are necessary to the accused service, but nevertheless, Mr. Barry applies the 25% rule to all the projected revenue from Gogo® without consideration of this admittedly important factual circumstance.

Moreover, Mr. Barry assumed, without any stated basis, that the technology in the '858 patent is essential to the Gogo® service, a circumstance that is central to the underlying assumptions of the 25% Rule. Mr. Barry admitted at his deposition that when an acceptable non-infringing alternative is available, the 25% rule is less informative than the cost of the alternative, and that he believes that the overall cost of an acceptable non-infringing alternative is a cap on what a licensee would pay to license a patent. (Barry Dep., Hankinson Ex. 1 at 57:3-58:10). But again, Mr. Barry's report is devoid of any inquiry into potential acceptable non-infringing alternatives in this case. Mr. Barry even ignored one common-sense non-infringing alternative addressed by Defendants' technical expert Dr. William Michalson. As the Court is aware, a central contention of Plaintiff in this case is that, in the accused Gogo® system, a computer on the plane controls or limits "time" as required by all of the independent claims of the '858 patent by enabling the system when the plane is above 10,000 feet. Although Defendants disagree that enabling the system when the plane is above 10,000 feet constitutes

controlling or limiting "time" within the meaning of the claims, Dr. Michalson discussed in his October 16, 2009 report the potential for a member of the flight crew to manually flip a switch -- a switch already present in the Gogo®-installed planes -- to accomplish the same effect. Such a manual approach would clearly avoid infringement, since the claims require that the so-called "control computer" control or limit time. At the very least, Mr. Barry should have consulted with a technical expert to see if this or other alternatives would be acceptable. He failed to disclose any such inquiry, and he and Plaintiff's technical expert failed to mention any of the alternatives suggested by Dr. Michalson in their subsequent reports.

Compounding this failure of inquiry, Mr. Barry has contradicted himself regarding the admittedly central factor of acceptable non-infringing alternatives. At his deposition, Mr. Barry stated repeatedly that he does not know whether there are acceptable non-infringing alternatives to the '858 patent. (Barry Dep., Hankinson Ex. 1 at 184:12-15 and at 185:21-23 ("Q: So you're saying you don't know whether there are viable design-arounds at this point; is that right? A: Right....Q: You don't know one way or the other whether there are viable alternatives, do you? A: No."). Yet, in his report, Mr. Barry stated the opposite (notably with no reliance on a technical expert or any other support): "It is my understanding that no effective alternatives for wireless data transmission exist which can facilitate broadband access in a radio frequency restricted environment. Without access to the technology claimed by the '858 patent, Aircell could not economically offer in-flight broadband service." (Barry Report, Hankinson Ex. 3 at 8). This self-contradictory "understanding" is another indication that Mr. Barry's proposed testimony is unreliable and should be excluded.

Further, Mr. Barry's 25% Rule analysis is inappropriately predicated on an admittedly uncertain forecast from a start-up business line. Mr. Barry admitted at his deposition that the forecasts of start-up businesses are "subject to a good deal of uncertainty," and that the "degree of uncertainty" about applying the 25% Rule is "highlighted" in the case of a start-up business. (Barry Dep., Hankinson Ex. 1 at 208:13-209:18). Mr. Barry offers no explanation for why a start-up business confronting such uncertainty in its projections would be willing to take a

license at a royalty calculated at 25% of its projected profits. Nor do the real-world practices of the parties in this case provide any support for applying the 25% rule in the hypothetical negotiation -- to Mr. Barry's knowledge, neither Aircell nor AMBIT has ever applied the 25% Rule in an actual negotiation. (*Id.* at 190:3-19).

In addition, Mr. Barry's opinions regarding the 25% rule are unreliable because he purports to justify his use of the rule with so-called "confirmatory" research that, when examined, simply defies logic. Mr. Barry stated at his deposition that the uncertainty of the 25% Rule in the context of start-up businesses is the reason that he "tried to gather some comparable licenses" as a "secondary" measure. (*Id.* at 209:12-24).[6] But Mr. Barry's list of licenses cannot be said to confirm or repair his 25% Rule analysis in any way whatsoever. All ten of Mr. Barry's listed royalties are below the 11.8% royalty figure yielded by Mr. Barry's application of the 25% Rule. Nine out of ten of his listed royalties are less than half of that figure. Moreover, the lone 10% royalty figure on Mr. Barry's list (the first ASI/ASIQ agreement): (1) may not involve a patent; (2) includes developmental and marketing assistance; and (3) was disclosed to the SEC as a related-party transaction. (*See supra* item 1 in Table 1). To say that this range of royalty

---

[6] Here is the referenced exchange:

> Q: Have you ever seen a start-up company employ the 25 percent rule as you are using it here?
> A: I can't give you an example on the fly like that, no.
> Q: But you'll agree with me, it's replete with danger, because start-ups' forecasts are inherently risky and suspect, right?
> A: They're subject to a good deal of uncertainty. I'm sure there are times when they're underrealized, and I'm sure there are times when they're overrealized.
> Q: And that's why using the 25 percent rule alone is a dangerous proposition in a patent case like this, isn't it?
> * * *
> A: I don't know if I'd go so far as to call it dangerous. There's a degree of uncertainty about it that is highlighted by the fact of its start-up nature, and I think that's obvious to all, but that's why I also tried to gather some comparable licenses from the publicly available RoyaltySource data that we've gone over today at length.

(*Id.* at 208:21-209:18).

numbers confirms Mr. Barry's 25% Rule analysis or renders it less uncertain is logically indefensible and wholly unreliable.

In short, Mr. Barry has chosen an inappropriate "rule of thumb" as his primary methodology, has failed to address several facts that he admits are important to that methodology, and has failed to offer any defensible check on his rule of thumb's admitted "uncertainty" in the start-up business context. The Court should preclude Mr. Barry from offering his unreliable and unhelpful opinions to the jury.

### C. Mr. Barry Disclosed An Untimely Supplemental Report Demonstrating Additional Indicia of Unreliability.

Mr. Barry's initial expert report was served October 16, 2009, and Defendants' damages expert Mr. Arst disclosed a responsive report on November 5, 2009. The Scheduling Order in this case set a November 17, 2009 deadline for rebuttal reports. (Dkt. No. 31 at 12.) But Mr. Barry did not disclose any rebuttal report at that time. Nor did he produce a rebuttal report as of the time of his December 4, 2009 deposition. Expert discovery closed December 5.

Then, on December 21, 2009, Plaintiff served a supplemental report from Mr. Barry. The report contained no explanation for its untimely rebuttal arguments regarding Mr. Arst's analysis, and no discussion of the Court's claim construction (the Scheduling Order's only stated exception for expert report deadlines is that the parties may supplement expert reports within 30 days after a *Markman* ruling). (Barry Supp'l Report, Hankinson Ex. 5; Dkt. No. 31 at 12 (Scheduling Order)).

Despite all of the information about Mr. Barry's so-called "adequate proxies" that was admitted at his deposition, and all the extra time that had passed in which Mr. Barry could have done additional research, Mr. Barry's supplemental report did not reflect any revision or supplementation regarding his list of royalty figures from abstracts. Mr. Barry did add some information about an agreement that AMBIT entered into with Nokia, an agreement that he previously discarded, and appears still to consider irrelevant. (Barry Supp'l Report, Hankinson Ex. 5 at 1-2). The new revelation was a conversation with Plaintiff's principal, Mr. Crowley,

about "the anticipated sales volume for Nokia's CARK-57," and a conclusion on the effective running royalty rate of Plaintiff's license agreement with Nokia. (Barry Supp'l Report, Hankinson Ex. 5 at 2). This comment and calculation are *prima facie* suspicious because Mr. Barry fails to include an actual number for the "anticipated sales volume" allegedly provided to him by Mr. Crowley, jumping straight from the descriptive term "modest" to a specific "12%" effective royalty rate. (*Id.*) Such suspicions are well founded, because at Mr. Crowley's deposition, he disavowed having any knowledge of an anticipated sales volume for products subject to the AMBIT/Nokia license:

> **Q: What were the [Nokia product] sales volumes?**
>
> **A: I forget what they were.**
>
> **Q: Less than a million units a year?**
>
> **A: I don't know.**
>
> * * *
>
> Q: Do you still have data from Nokia reflecting their volumes and projected volumes?
>
> A: You know, it was done during a conversation with them.
>
> Q: Do you have notes on that?
>
> A: I have very limited notes on that.
>
> **Q: What's your understanding, your best recollection of their volumes and projected volumes?**
>
> **A: Well, I would just be guessing, so I'm not going to guess.**

(Crowley Dep., Hankinson Ex. 6 at 210:4-211:1 (emphasis added)). Mr. Barry also cites no documents regarding the unspecified Nokia sales volumes on which he bases his purported calculation, in particular making no mention of the AMBIT document cited by Defendants' expert Mr. Arst in his analysis of Nokia's sales volumes and anticipated growth rates.[7] Rather,

---

[7] Plaintiff has designated this document as "CONFIDENTIAL-ATTORNEY'S EYES ONLY" under the Protective Order. Defendants can provide a copy to the Court under seal upon request.

Mr. Barry relies wholly on his cryptic reference to a conversation with Mr. Crowley that contradicts Mr. Crowley's deposition testimony.

Thus, not only do the opinions in Mr. Barry's supplemental report suffer from untimely disclosure such that they should be inadmissible at trial, but they also continue and compound the errors, contradictions, and inaccuracies found in Mr. Barry's initial report. This is more reason for the Court to preclude Mr. Barry from testifying at trial in this matter.

## CONCLUSION

Both of Mr. Barry's two quantitative methodologies are unreliable and are unreliably applied to the facts of this case, rendering his analysis irrelevant and unhelpful to the jury under Federal Rule of Evidence 702 and the Supreme Court's guidelines in *Daubert*. His analysis is also of the type that the Federal Circuit has found cannot carry a plaintiff's burden to prove non-speculative damages. Accordingly, and for all the reasons set forth above, the Court should preclude Christopher C. Barry from testifying at trial in this action.

Dated: April 28, 2010

*/s/ Marc C. Laredo*

Marc C. Laredo, BBO#543973
Email: laredo@laredosmith.com
Mark D. Smith, BBO#542676
Email: smith@laredosmith.com
**LAREDO & SMITH, LLP**
15 Broad Street, Suite 600
Boston, MA 02109
Tel: 617-367-7984
Fax: 617-367-6475

**ATTORNEYS FOR DEFENDANTS DELTA AIR LINES, INC. AND AIRCELL LLC**

OF COUNSEL:
David T. Pritikin
Email: dpritikin@sidley.com
Thomas D. Rein
Email: trein@sidley.com
Stephanie P. Koh
Email: skoh@sidley.com
Thomas F. Hankinson
Email: thankinson@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Tel: 312-853-7000
Fax: 312-853-7036

Tung T. Nguyen
Email: tnguyen@sidley.com
**SIDLEY AUSTIN LLP**
717 N. Harwood, Suite 3400
Dallas, Texas 75201
Tel: 214-981-3300
Fax: 214-981-3400

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

April 28, 2010

*/s/ Marc Laredo*
Marc C. Laredo BBO#543973